**CHICAGO TRIBUNE COMPANY,
Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent, Cross–
Petitioner.**

**and**

Chicago Typographical Union No. 16, Communications Workers of America, AFL–CIO, Petitioner, Cross–Respondent.

Nos. 91–3135, 91–3275 and 91–3317.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1992.

Decided Sept. 10, 1992.

**934**

John C. Truesdale, N.L.R.B., Contempt Litigation Branch, Washington, D.C., Elizabeth Kinney, Emilie F. Fall, N.L.R.B., Chicago, Ill., Aileen A. Armstrong, Margaret E. Luke (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., for N.L.R.B.

R. Eddie Wayland (argued), John J. Matchulat, Michael D. Oesterle, King & Ballow, Nashville, Tenn., for Chicago Tribune Co.

Gail E. Mrozowski (argued), Cornfield & Feldman, Chicago, Ill., for Chicago Typographical Union No. 16, Communications Workers of America, AFL–CIO.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and GIBSON, Senior Circuit Judge.*

POSNER, Circuit Judge.

Employer and union, both dissatisfied with the Labor Board's order, ask us to set different parts of it aside, and the Board asks us to enforce it in its entirety. The case concerns the interpretation of the management-rights clause, and related documents, in the collective bargaining agreement between the publisher of the *Chicago Tribune* and the union that represents employees in the *Tribune's* composing room. Without negotiating with the union, the company adopted certain standards of employee conduct that, it claims, the management-rights clause entitled it to adopt. The Board (304 N.L.R.B. no. 62 (Aug. 27, 1991)) agreed except with regard to the standard concerning drug and alcohol use, and we begin with that issue.

The management-rights clause emerged from a long history of wrangling (more politely, bargaining). The parties draw different inferences from the history. We find it singularly unilluminating. It is full of unintelligible sentence fragments, such as a union negotiator's note that one of the company's proposals was "OK—with additional clause provided by the Union—also union proposal re: Zipper," from which the company draws a significance that eludes us. The company also wants us to give great weight to the fact that the Board voted against it on the drug and alcohol issue by 2–1, reversing the administrative law judge, who had ruled for the company. The company says that that makes the score 2–2. Would it were so; then the Supreme Court could not reverse a one-sided en banc decision of this court by a 5–4 vote—and could not reverse a unanimous en banc decision of this court (i.e., 11–0) by *any* vote (9–0 wouldn't do it). The rule of one person, one vote does not apply to officers at different levels of a judicial or administrative hierarchy.

▮ What is true is that an administrative law judge's determinations of credibility are entitled to a certain weight by a reviewing court, because he sees and hears the witnesses and the Board has only a transcript of their testimony. *Universal*

* Hon. Floyd R. Gibson, Senior Circuit Judge of    the Eighth Circuit, sitting by designation.

*Camera Corp. v. NLRB*, 340 U.S. 474, 492–97, 71 S.Ct. 456, 466–69, 95 L.Ed. 456 (1951). But that is not a factor here. A number of decisions seem to go further, suggesting without express limitation to issues of credibility that judicial review of a decision by the Board is less deferential when the Board is reversing the administrative law judge. E.g., *International Union, UAW v. NLRB*, 802 F.2d 969, 971 (7th Cir.1986); *C.E.K. Industrial Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 355 (1st Cir.1990); *Litton Microwave Cooking Products Division v. NLRB*, 868 F.2d 854, 857 (6th Cir.1989); *Centre Property Management v. NLRB*, 807 F.2d 1264, 1268 (5th Cir.1987). No doubt that is true as a practical matter when factual determinations, even if they don't involve credibility, are involved, but it should not be treated as a fixed policy or a rigid rule. We want simplicity, not complexity, in standards of appellate review, *United States v. Spears*, 965 F.2d 262, 269–72 (7th Cir. 1992)—though for completeness we add that sometimes judicial review is of an administrative law judge's decision, and it is the appellate tribunal within the agency, corresponding to the Labor Board, that receives no deference. *Old Ben Coal Co. v. Prewitt*, 755 F.2d 588, 589 (7th Cir.1985). That is not the case with review of the Labor Board's decisions. *Id.* at 590.

■ The materials for the decision of this appeal are really very simple. There is to begin with a management-rights clause which provides, so far as pertinent to this case, that "except as specifically limited by the express language of this Agreement ... the Company has and retains exclusively to itself ... the exclusive right ... to establish and enforce reasonable rules and regulations relating to the operation of its facilities and to employee conduct." So we must consider first whether the challenged standard, authorizing testing for the presence of drugs or alcohol, is a regulation relating to employee conduct, and next whether, even if so, language elsewhere in the collective bargaining agreement carves the standard out of the management-rights clause.

The standard has several parts but only two need be discussed. One regulates conduct on the job and provides that "whenever Management has an 'articulable belief' that an employee may be under the influence of an intoxicant during working hours on Company property ... [he] will be required to undergo a medical evaluation and take an alcohol and/or drug test as determined by the Medical Division." (The alcohol test is a blood test, the drug test a urine test.) The other part regulates conduct off the job. It provides that the sale, distribution, or manufacture of alcohol or illegal drugs is a dischargeable offense—and if the employee is arrested for any of these activities he is to be discharged regardless of the eventual disposition of the charge for which he was arrested. It also makes "off-the-job illegal drug activities or alcohol addiction that could have an adverse effect on an employee's job performance or that would jeopardize the safety of other employees, the public, Company equipment, or the Company's relations with the public or its employees" grounds for discharge.

We have no doubt that the alcohol and drug standard the critical parts of which we have just quoted is a regulation relating to employee conduct. That is plainest with respect to being drunk or high on the job, but it is plain enough with regard to conduct off the job that affects performance on the job. Even if the effect takes the form of a harm only to the company's public relations, the ultimate consequence is to make the employee less valuable to the company.

No doubt there are limits to a company's *reasonable* concern with the off-duty conduct of its employees. Suppose the publisher of the *Tribune* made divorce a ground for discharge. The prevention of this sort of abuse of the "employee conduct" provision in the management-rights clause lies, however, precisely in the requirement that the company's rule or regulation relating to such conduct be "reasonable." Our hypothetical divorce rule would be unreasonable, unless perhaps the employer was a religious organization and the religion forbade divorce. We do not under-

stand the union to be arguing that the alcohol and drug standard is unreasonable, only that it does not relate to employee conduct—an argument we barely understand.

■ But we must consider whether the standard is inconsistent with language or implications elsewhere in the agreement. *Dreis & Krump Mfg. Co. v. International Association of Machinists*, 802 F.2d 247, 252–53 (7th Cir.1986). The agreement provides that the "General Laws" of the international union, which are appended to the agreement, "shall govern relations between the parties on those subjects concerning which no provision is made in this Agreement." The General Laws include a provision that "No journeyman shall be required to submit to a physical examination as a condition of employment." The parties, oddly overlooking the question whether the provision even applies to retention of employment, as distinct from obtaining employment in the first place, have treated us to an elaborate Scholastic dispute over whether a blood or urine test is "a physical examination." Literally it is not; it is a part of some physical examinations, but is often administered separately from any "physical examination" as that term is ordinarily understood. The Board argues that any part of a physical examination is itself a physical examination. This is like arguing that any part of an atom must be an atom too, or that a person's finger is a person. Physical examinations typically include such things as weighing the person being examined and asking him whether he's had any illnesses since the last examination. These components are not themselves physical examinations. The examination is the ensemble.

But if we have regard not to the meaning of "physical examination" but to the purpose of the provision in the General Laws concerning it, we can see the basis for an argument that an employee cannot be required to pass a test of medical fitness, such as a blood or a urine test. After all, these workers are more likely to be concerned about their jobs than about the modest invasion of privacy involved in a "real"

physical examination, and the jobs are as much threatened by the tests as they are by the doctor's poking in private places. We must not forget, however, that the General Laws apply only to "subjects concerning which no provision is made in" the collective bargaining agreement. It's a gap filler. There is no gap concerning employee conduct. The management-rights clause gives management carte blanche to impose rules relating to employee conduct, provided only that they are reasonable rules. The alcohol and drug standard is a reasonable rule of employee conduct.

The part of the standard that regulates employee conduct off the job makes no provision for medical tests, but the Board concluded that "the language of the management-rights clause lacks the specificity to warrant the conclusion that it authorizes such far-reaching rules governing conduct away from the workplace." It thought the rules far-reaching because, for example, they could result in the discharge of a worker arrested for illegal drug activities but later exonerated.

The Board is here appealing to the oft-intoned principle that a waiver of statutory rights, as of rights generally, must be clear and unmistakable (as it unquestionably is with regard to the regulation of on-the-job conduct, the first part of the challenged standard). *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *International Union, UAW v. NLRB, supra*, 802 F.2d at 973. Yet, as the waiver need not be express, *Metropolitan Edison Co. v. NLRB, supra*, 460 U.S. at 708 n. 12, 103 S.Ct. at 1477 n. 12; *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *G. Heileman Brewing Co. v. NLRB*, 879 F.2d 1526, 1532–33 (7th Cir. 1989); *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 248–49 (7th Cir.1988); *NLRB v. New York Telephone Co.*, 930 F.2d 1009, 1011 (2d Cir.1991); *NLRB v. United Technologies Corp.*, 884 F.2d 1569, 1575 (2d Cir.1989), we wonder what the exact force of the "clear and unmistakable" principle can be when the parties have an express written contract and the issue is what it

means, or whether the principle makes much sense now that the Supreme Court has held that even a waiver of precious constitutional rights need not be proved by clear and convincing evidence. *Colorado v. Connelly,* 479 U.S. 157, 167–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986).

The union had a statutory right to bargain over the terms of employment, 29 U.S.C. § 158(d), of which a provision regulating behavior off the job was one, but it gave up that right, so far as the subjects comprehended by the management-rights clause were concerned, by agreeing to the clause. We have a simple question of interpretation—and do not see how the Board could draw the line between on-the-job and off-the-job conduct. The clause gives management the exclusive right to establish reasonable regulations relating to employee conduct. There is no limitation to conduct on the job and even if there were, a regulation of conduct off the job could be "related" to conduct on the job and thus come within the scope of the clause.

In expressing concern about the far-reaching character of the regulation of conduct off the job, the Board overlooked the word "reasonable." The standard may be unreasonable in making arrest a ground for immediate discharge without waiting to see whether the employee actually violated any law. If so, the standard, or that part of the standard, is invalid. But this has nothing interesting to do with the doctrine of waiver. It is a question of interpretation. Of course people should not be tripped into forgoing valuable rights, but where as in this case a union agrees to a broadly worded management-rights clause the scope of that clause depends on the usual principles of contract interpretation rather than on a doctrine that tilts decision in the union's favor. Cf. *Truck Drivers Local 705 v. Schneider Tank Lines, Inc.,* 958 F.2d 171 (7th Cir.1992); *Sheet Metal Workers Local 19 v. Keystone Heating & Air Conditioning,* 934 F.2d 35, 40–41 (3d Cir.1991); *Plumbers and Steamfitters Local No. 150 Pension Fund v. Vertex Construction Co.,* 932 F.2d 1443, 1448 (11th Cir.1991). It is true that many cases, illustrated by *Operating Engineers Pension Trusts v. B & E Backhoe, Inc.,* 911 F.2d 1347, 1352 (9th Cir.1990), say that the principles governing the interpretation of labor contracts are special. We expressed skepticism about these dicta in *Schneider Tank Lines.* Perhaps, though, all that these courts are trying to do is to make sure that the principles of contract interpretation are not used to subvert federal labor law. Fair enough, but there is no suggestion that a grudging interpretation of management-rights clauses is necessary to fulfill the goals of federal labor law.

■ And the breadth of a contractual provision need not detract from the clarity of its meaning. Indeed, a managements-right clause can be drawn so broadly as to leave no doubt that a particular regulation was intended to be within its scope. *NLRB v. United Technologies Corp., supra,* 884 F.2d at 1575; *EPE, Inc. v. NLRB,* 845 F.2d 483, 491 (4th Cir.1988). Unions employ experienced contract negotiators, who do not need special rules of construction to protect them from being outwitted by company negotiators. We agree, therefore, that "where the contract fully defines the parties' rights as to what would otherwise be a mandatory subject of bargaining, it is incorrect to say that the union has 'waived' its statutory right to bargain; rather, the contract will control and the 'clear and unmistakable' intent standard is irrelevant." *Local Union No. 47 v. NLRB,* 927 F.2d 635, 641 (D.C.Cir.1991). See also *United Mine Workers v. NLRB,* 879 F.2d 939, 944 (D.C.Cir.1989).

■ The Board might still prevail in this case if we were required to give its interpretation of the contract a special weight. We are not. *Litton Financial Printing Division v. NLRB,* — U.S. —, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991); *Jones Dairy Farm v. NLRB,* 909 F.2d 1021, 1028 (7th Cir.1990); *Local Union No. 47 v. NLRB, supra,* 927 F.2d at 640. The Board is not an expert in contract interpretation. Most collective bargaining agreements contain arbitration clauses, and most disputes over the meaning of those agreements are

decided therefore by arbitrators and are never seen by the Board. The Board has the power to interpret a collective bargaining agreement as an incident to adjudicating an unfair labor practice charge, as it did in this case, but its interpretation does not bind us, as an arbitrator's would. "[W]e apply a *de novo* standard of review when interpreting the contract itself." *Id.* at 641.

The collective bargaining agreement at issue in this case had an arbitration clause, and the union could have challenged the drug and alcohol standard by filing a grievance, the first step under the agreement to invoking arbitration. Ordinarily when a union has a good contractual remedy the Board will stay its hand rather than spend public funds on an unfair labor practice proceeding unlikely to provide the union with any greater relief than it could obtain from the arbitrator. *Collyer Insulated Wire*, 192 N.L.R.B. 837, 839 (1971); *United Technologies Corp.*, 268 N.L.R.B. 557, 558 (1984); *Hammontree v. NLRB*, 925 F.2d 1486, 1490 (D.C.Cir.1991) (en banc). We are unclear why the Board did not follow that procedure in this case. Of course if an employer adopts an unreasonable interpretation of an agreement in order to evade its duty to bargain collectively, the Board has a reason to intervene. That is not this case. The Board intervened unnecessarily and has misconstrued the contract. We need not decide whether the union can still file a grievance challenging the drug and alcohol standard as unreasonable in whole or part.

■ The union's challenge to the Board's order can be discussed very briefly. It is extremely weak. We shall discuss only one of the two regulations of employee conduct that it challenges, that which provides for "progressive" discipline for absenteeism and related infractions, culminating in discharge if the employee commits 11 violations of the regulation in a 12–month period. The regulation is applicable even if the absenteeism is due to illness, provided that it is not authorized by the company's sick-leave policy. The union claims that this regulation infringes a provision of the General Laws that a journeyman absent either because he is working for the union or because he is ill "shall not suffer loss of situation ... while so employed or so incapacitated, in the event a substitute is not available." The reference to "substitute" is to a practice, since abolished, whereby a list of persons available for substitute employment was posted in the composing room and an employee who was going to be absent could make an arrangement with one of the substitutes to take his place. The union argues that since the substitute system has been abolished, no substitute is available for a sick worker and therefore he cannot be disciplined.

When the substitute system was in force, the consequences of an absence for the employer were minimized, so there was no compelling reason to discipline an employee who was unable to use the system because for some reason no substitute was available when he needed one. With all the substitutes gone, absenteeism is a more serious problem for the company so naturally it needed a stricter policy. The provision of the General Laws must therefore be construed as being limited to the vanished regime of substitutes.

This is an adequate ground to support this part of the Board's order, though our preferred alternative for reasons discussed earlier would be to rule that the General Laws have no application to regulations comprehended within the management-rights clause.

No other issues need be discussed. The company's petition for review is granted and the union's denied, and the Board's order will be enforced in part and denied enforcement in part, in accordance with this opinion.