CHICAGO PARK DISTRICT, Petitioner, v. ILLINOIS LABOR RELATIONS BOARD, Local Panel, *et al.*, Respondents.

First District (2nd Division)   No. 1—03—1931

Opinion filed November 9, 2004.

J. Stuart, of Meckler, Bulger & Tilson, and Sean F. Taylor, of Chicago Park District, both of Chicago, for petitioner.

Lisa Madigan, Attorney General, of Chicago (Gary Feinerman, Solicitor General, and Mary Patricia Kerns, Assistant Attorney General, of counsel), for respondent Illinois Local Labor Relations Board.

Patricia A. Collins and Ryan A. Hagerty, both of Asher, Gitter, Greenfield & D'Alba, Ltd., of Chicago, for respondent Service Employees International Union.

JUSTICE HALL delivered the opinion of the court:

The Chicago Park District (the District) brings a direct administrative review appeal challenging an order of the respondent, the Illinois

Labor Relations Board, Local Panel (the Board), upholding a finding by an administrative law judge (the ALJ) that the District violated sections 10(a)(1) and 10(a)(4) of the Illinois Public Labor Relations Act (the Act) (5 ILCS 315/10(a)(1), (a)(4) (West 2002)) by reducing the hours of its part-time employees without notice or an opportunity to bargain with their exclusive representative, the respondent, the Service Employees International Union, Local 73 (the Union).

The following issues are submitted for our review: (1) whether the Act required the District to bargain before implementing the reduction in hours; (2) whether the parties' collective bargaining agreement waived mandatory bargaining over the reduction-in-hours issue; and (3) whether the Board's finding that the District refused to bargain was against the manifest weight of the evidence. We affirm the decision of the Board.

On January 18, 2002, the Union filed an unfair labor practice charge against the District. Following an investigation, the Board issued a complaint for hearing. The complaint alleged that there was a collective bargaining agreement (the Agreement) between the District and its employees, who were represented by the Union. On or about January 1, 2002, the District reduced the hours of work for certain of its employees without providing notice to the Union or the opportunity to bargain with the Union. The Union alleged that the District's conduct violated sections 10(a)(1) and 10(a)(4) of the Act. A hearing on the complaint commenced on July 11, 2002, and concluded on July 17, 2002. The pertinent testimony is summarized below.

The Union presented the testimony of several part-time hourly employees substantiating that their hours had been cut from their regular 25 to 30 hours per week prior to 2001 to 20 hours per week in 2002.[1] The Union also presented the testimony of Cynthia Rodriguez, chief negotiator for the Union with the District.

Ms. Rodriguez testified that, in October 2001, the Union began negotiating a new contract with the District. While Ms. Rodriguez has no involvement in the budget, she has to determine how the budget will affect the Union members. Although budget hearings are held in the summer and community input is obtained, a copy of the budget is not available until two weeks before the actual budget is passed. The copy of the budget is then sent to the research department to determine what the impact on the members will be.

Ms. Rodriguez attended the budget hearings due to concerns that the hours of the employees were to be cut. She received a copy of the budget at the end of November 2001. On November 20, 2001, she

---

[1]The District does not dispute that the hours were reduced.

received a fax from Francine Bailey, the District's human resource director, informing her that the District planned to reduce employee hours in 2002 and listing the employees who would be affected. At the next contract negotiations meeting with the District, Ms. Rodriguez stated that she had received Ms. Bailey's fax and that she was demanding to bargain over the effects of the hours reduction before continuing negotiations on the economics of the new contract. She also stated that an information request was necessary prior to addressing the hours-reduction issue. The parties then addressed noneconomic issues.[2] Ms. Rodriguez submitted her information request on December 3, 2001.

Ms. Rodriguez explained that when she referred to "effects bargaining," she meant both the cuts and their effect. However, she acknowledged that at the time of the November negotiation session, her request to bargain was only over the effects of the reductions. Ms. Rodriguez further explained that by asking to bargain over the effects of the cuts, she was also indicating that she wished to bargain over the actual reduction itself.

Prior to the next scheduled negotiating session, Ms. Rodriguez was contacted by Charlie Rose, the attorney for the District. Mr. Rose informed her that he did not have all the information she requested. The meeting was rescheduled for December 13, 2001. The December 13, 2001, session was again devoted to noneconomic proposals.

Following the session, Ms. Rodriguez grew concerned that, although they had not yet bargained over the cuts in hours, because it had not yet been discussed, the District might proceed to implement the cuts on January 1, 2002. When she called Mr. Rose to tell him not to implement the cuts, he informed her that the cuts were going to be implemented January 1, 2002, and that he was not going to bargain the effects of the cuts. Mr. Rose further informed her that the District was taking the same position it had on the cuts for the 2001 budget, namely, that the District was not required to bargain over the cuts.

Following their telephone conversation, Ms. Rodriguez wrote a letter to Mr. Rose summarizing their conversation and advising him that the Union would file an unfair labor charge. In his responsive letter, Mr. Rose pointed out that the Union had never requested that the implementation of the reduction in hours be postponed, that the Union had not taken the position that contract negotiations would not continue until the reduction in hours was negotiated, that while the Union had demanded information, it did not refuse to negotiate the

---

[2]The negotiations are divided into economic and noneconomic issues. Noneconomic issues are language issues.

new contract until after the hours reduction was negotiated, that Ms. Rodriguez had not objected to the cancellation of the December 6, 2001, session and that, at this point, the District's position with respect to formal negotiations over the reduction-in-hours issue was consistent with its position in the pending litigation over the 2001 reduction in hours.

On cross-examination, Ms. Rodriguez stated that she wrote the letter to Mr. Rose because their telephone conversation was the first time he had informed her that the District refused to bargain the reduction-in-hours issue. She concluded that the District was refusing to bargain based upon Mr. Rose's references to the pending litigation between the parties. According to Ms. Rodriguez, she never had the opportunity to propose alternatives to the District's reduction in employees' hours.

On behalf of the District, Gary Gordon, the District's director of budget and management, testified that he was responsible for the preparation of the District's budget. The process begins in the summer by reviewing the previous year's expenditures, revenue estimates and economic projections. In addition to 4 formal budget hearings, there were 22 localized neighborhood budget hearings.

As of November 1, 2001, when the 2002 budget was drafted, the District was anticipating an increase in revenues from approximately $328 million to $334 million. However, because of the increases that went into the budget, there was insufficient money to cover anticipated operating expenses. Specifically, the available money for 2002 would be insufficient to continue the staffing levels from 2001. The District wanted to avoid layoffs, so a wage freeze for nonunion employees was implemented and certain nonunion positions eliminated. Other than limiting the funds, the budget did not dictate the measures to be taken to keep spending in line with the budget.

Mr. Gordon related that on December 14, 2001, following the budget presentation, he had a conversation with Ms. Rodriguez. Ms. Rodriguez thanked him for the restoration of 11,000 hours to district employees which had been preliminarily written out of the budget. She then stated that now they "just needed to worry about the rest of them." Mr. Gordon responded that they should then discuss the Union giving up the wage increase, to which Ms. Rodriguez laughed.

On cross-examination, Mr. Gordon agreed that the savings to the District from the reduction in hours amounted to approximately $280,000.

Charlie Rose, an attorney, testified that he had represented the District in contract negotiations and served as chief negotiator between the District and the Union. According to Mr. Rose, during the

November 26, 2001, contract negotiation session, the Union wanted to negotiate the hours reduction, and Ms. Rodriguez stated that an information request regarding the reduction in hours would be forthcoming. The parties never discussed discontinuing bargaining for a successor agreement until the issue of the reduction in hours was bargained.

At the December 13, 2001, contract session, the Union did not present any proposals for resolving the reduction-in-hours issue. The Union indicated that the reduction in hours would affect its economic proposal, and Ms. Rodriguez explained that the Union needed the information it requested in order to make an evaluation. The next contract session was scheduled for January 10, 2002.

On December 19, 2001, Mr. Rose had a telephone conversation with Ms. Rodriguez. Ms. Rodriguez expressed her understanding that the successor contract would be put on hold and the reduction in hours would not be implemented until the parties had bargained over the reduction-in-hours issue. Mr. Rose explained to her that his understanding was that the parties were proceeding to negotiate the successor contract and that the Union would shape its economic proposals to reflect the reduction in hours. There was no agreement to delay or hold off negotiations on the successor contract. Mr. Rose denied refusing to negotiate over the reduction in hours; he was still willing to negotiate over any proposals the Union had to make with respect to the reduction in hours.

Mr. Rose acknowledged receiving Ms. Rodriguez's December 19, 2001, letter and that he responded to her by his letter of December 21, 2001. In his letter, Mr. Rose explained that it appeared that the Union was seeking an acknowledgment that the District was statutorily obligated to bargain over the reduction in hours, which was inconsistent with the position the District was then taking in the pending litigation. Nonetheless, the District remained willing to bargain over the reduction in hours.

On or about January 10, 2002, Mr. Rose spoke with Ms. Rodriguez, expressing his frustration that the Agreement had expired and the District still did not have the Union's economic proposal. In March 2002, the Union submitted its economic proposal, including proposals to deal with the reduction-in-hours issue. The District has not refused to negotiate over any of those proposals, and the parties were continuing to negotiate.

Following the hearing, the ALJ concluded as follows: the reduction-in-hours issue was a mandatory subject of bargaining; the District violated the Act by unilaterally reducing the hours of hourly employees without affording the Union the opportunity to bargain over the reduc-

tion in hours or its impact; and the Union did not waive its right to bargain, either contractually or by failing to present proposals prior to implementation of the hours reduction. The ALJ's findings of fact and conclusions of law were adopted by the Board.

The District timely appealed the Board's decision.

## ANALYSIS

### I. Mandatory Bargaining

#### A. *Standard of Review*

■ An administrative agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct, and the reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204, 692 N.E.2d 295 (1998). An administrative agency's findings on a question of law, on the other hand, are reviewed with less deference. Such determinations are reviewed *de novo. City of Belvidere*, 181 Ill. 2d at 205.

To determine whether the Agreement required the parties to bargain over the reduction-in-hours issue requires this court to examine the legal effect of a given set of facts. Therefore, a mixed question of law and fact is presented requiring the application of the clearly erroneous standard of review. *City of Belvidere*, 181 Ill. 2d at 205.

#### B. *Discussion*

■ Section 4 of the Act requires public employers to bargain collectively regarding policy matters directly affecting wages, hours, and terms and conditions of employment, as well as the impact thereon but does not require them to bargain over matters of inherent managerial policy. 5 ILCS 315/4 (West 2002).

■ The test to determine whether an issue is the subject of mandatory bargaining is set forth in *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 599 N.E.2d 892 (1992). Our supreme court stated as follows:

> "The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. *** If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.
>
> If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then the hybrid situation discussed in section 4 ex-

ists: the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment." *Central City Education Ass'n*, 149 Ill. 2d at 523.

The analysis then requires the Board to balance the benefits that bargaining would have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority. *Central City Education Ass'n*, 149 Ill. 2d at 523. Which issues are mandatory, and which are not, will be very fact-specific questions that the Board, given its experience, is eminently qualified to make. See *Central City Education Ass'n*, 149 Ill. 2d at 510 (courts give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute).

In determining whether the first prong of the *Central City* test has been fulfilled, the court must determine if the District's reduction in hours (1) involved a departure from previously established operating practices, (2) effected a change in the conditions of employment, or (3) resulted in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the bargaining unit. *City of Belvidere*, 181 Ill. 2d at 208.

The District argues that its decision to reduce employees' hours was not subject to mandatory bargaining because part-time employees have traditionally worked varying schedules and fluctuating hours and that part-time employees were never guaranteed that their schedules would remain static.

However, the fact that the employees worked fewer hours necessarily impacted the wages they earned. The testimony at the hearing established that the employees had regularly worked the same number of hours, the only change coming during the summer months when their hours were increased because of the summer programs. There was evidence that the reduction in hours did not result in a reduction in the amount of work the employees were expected to perform. It also appears that the reduction in hours resulted in a loss of benefits to the employees.[3] Therefore, the record establishes that the first prong of the *Central City* test has been satisfied.

The Union maintains that the District has failed to establish the second prong of the *Central City* test, arguing that the District did not establish that its decision to reduce hours was economically motivated and, therefore, not a matter of inherent managerial authority. However, as the Board points out, the record established that the reduction was driven by financial constraints, implicating the District's

---

[3]In the 2001 case, the Board found that the decrease in the number of hours worked decreased the employees' eligibility for employer-paid benefits.

concern about its overall budget and the standards of services it would provide in light of those financial concerns. Therefore, the second prong of the *Central City* test was satisfied.

The third prong requires a balancing of the benefits to the decisionmaking process against the burdens that bargaining would impose upon the District's authority. *Central City Education Ass'n*, 149 Ill. 2d at 523. The District argues that, based upon the complexity of adjusting the work schedules of employees in hundreds of locations to meet overall budgetary constraints while minimizing adverse impact on the District's priorities, the Board should have concluded that the burdens outweighed the benefits to the employees.

In *Georgetown-Ridge Farm Community Unit District 4*, 10 Pub. Employee Rep. (Ill.) par. 1044, Nos. 90—CA—0047—S, 90—CA—48—S (IELRB March 1, 1994), the Board found that the school district's decision to reduce the hours of its cooks was a matter of managerial authority. In weighing the burdens against the benefits, the Board stated as follows:

> "The benefits of bargaining an economically-motivated reduction in hours could be substantial. An exclusive representative may offer concessions in other areas to achieve the financial savings which the employer seeks or identify employees who wish to work reduced hours. Because of their close view of operations, employees in the bargaining unit may be able to identify cost-saving measures of which the employer is unaware. In addition ***, an exclusive representative affiliated with a state and national union *** has access to a collection of research and sample contract language. This information can enable the exclusive representative to suggest alternative solutions to the employer's financial problems." 10 Pub. Employee Rep. (Ill.) at IX—181.

The District argues that budget constraints required it to decide very quickly whether its priorities were best served by laying off employees, reducing hours or a combination of both. The District relies on *Community College District 508*, 13 Pub. Employee Rep. (Ill.) par. 1045, No. 94—CA—0013—C (IELRB March 7, 1997), in which a community college unilaterally consolidated classes with low enrollment, resulting in layoffs and hours reductions for bargaining unit members. In that case, the Board found the burdens bargaining would have imposed on the school district's authority to be substantial. However, in the present case, the District's concerns do not resemble the school district's concerns that it has been rendered unable to determine the most effective way to provide educational services.

Moreover, the District has not established the need for speed in implementing the reduction in hours. The budget itself did not require

that the District reduce the employees' hours, and therefore, the fact that the budget needed to be passed by the end of the year does not support the District's argument. Finally, the Union and the District were already in negotiations. As the Board in *Georgetown-Ridge Farm* stated:

> "In this case, the fact that contract negotiations concerning other issues affecting noncertified employees were occurring at the time of the District's decision to reduce the cooks' hours is another indication that the subject of the reduction in hours would have been amendable to bargaining. The existence of simultaneous negotiations on other issues would have facilitated the development of alternatives and concessions, and increased the opportunities for discussion." 10 Pub. Employee Rep. (Ill.) at IX—181.

We conclude that all three prongs of the *Central City* test have been met and that the Board's conclusion that the reduction-in-hours issue was a mandatory subject of bargaining was not clearly erroneous.

## II. Collective Bargaining Agreement

### A. *Standard of Review*

■ The parties disagree over the standard of review. The Board argues that the "clearly erroneous" standard applies because the question of waiver involves a mixed question of fact and law. The Union argues that the "manifest weight of the evidence" standard applies. See *West Chicago School District No. 33 v. Illinois Educational Labor Relations Board*, 218 Ill. App. 3d 304, 311, 578 N.E.2d 232 (1991). However, while the court applied the manifest weight of the evidence standard in that case, the decision was based on a determination of factual matters. See *West Chicago School District No. 33*, 218 Ill. App. 3d at 311 (record reflected that at the time the waiver clause was negotiated, the association did not intend to relinquish its midterm bargaining rights, and the bargaining history demonstrated that the association would not agree to such a waiver).

Contract interpretation is a matter of law to which the court applies a *de novo* standard of review. See *Illinois Fraternal Order of Police Labor Council v. Town of Cicero*, 301 Ill. App. 3d 323, 335, 703 N.E.2d 559 (1998) (the court applied *de novo* standard to interpretation of collective bargaining agreement). There are no factual determinations in interpreting the Agreement in this case. Therefore, this court applies a *de novo* standard of review.

### B. *Discussion*

The District contends that, pursuant to various provisions of the Agreement, it had the authority to reduce employee hours without

having to bargain with the Union. The District relies on the following pertinent sections of the Agreement:

"ARTICLE IX
Management Rights

It is understood and agreed that the District possesses the sole right and authority to operate and direct the employees of the District and its various departments in all aspects, including but not limited to, all rights and authority exercised by the District ***. These rights include, but are not limited to, the following:

* * *

g. To lay off or relieve employees for lack of work, lack of funds, reorganization, or other reasons promoting the efficiency of the District.

* * *

ARTICLE XIX
Hours of Work and Overtime

Section 19.1. *Application.* *** Nothing contained herein shall be construed as a guarantee of hours of work per day or per week or as preventing the District, after notice to the Union and an offer of any opportunity to discuss the matter, from restructuring the normal workday or workweek ***.

* * *

Section 19.5. *Changes in Normal Workweek and Workday.* Should it be necessary, in the interest of efficient operations, to establish schedules departing from the normal workday or workweek, the District shall give notice of such change to the affected bargaining unit employee as far in advance as is reasonably practical, but not less than five (5) business days prior to the effective date of said change, except in unusual or emergency situations.

* * *

ARTICLE XXVIII
Miscellaneous

* * *

Section 28.2 *Policy Changes.* During the term of this Agreement, the District agrees to notify the Union when or if it contemplates a policy change which will affect wages, hours, or terms and conditions of employment of employees working under this Agreement. The District further agrees to notify the Union in writing within ten (10) working days if it intends to implement such a change."

The District argues that its right, pursuant to article IX of the Agreement, "[t]o lay off or relieve employees for *** lack of funds" gives it the authority to reduce employee hours. The District complains that the Board ignored a 1995 arbitrator's decision in which the arbitrator determined that the District could relieve employees of

work for budgetary or efficiency reasons without having to bargain with the Union, as long as the District gave the Union the notice required by the policy change provision in article XXVIII.

However, the 1995 arbitrator's decision concerned layoffs as opposed to a reduction in hours. In *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 274 Ill. App. 3d 327, 653 N.E.2d 1357 (1995) (*AFSCME*), this court held that using the term "to relieve employees from duty" vested the Illinois Department of Central Management Services with the authority to unilaterally "lay off" employees. *AFSCME*, 274 Ill. App. 3d at 335. Reduction in hours was not addressed.

■ The District then argues that, under the "contract coverage" or "covered by" test, this court should merely use the customary principles of contract interpretation, in contrast to the Board's approach of searching for unmistakable evidence that the Union waived its bargaining rights. The District relies on the following cases utilizing the "contract coverage" test: *Conoco, Inc. v. National Labor Relations Board*, 91 F.3d 1523 (D.C. Cir. 1996); *Gratiot Community Hospital v. National Labor Relations Board*, 51 F.3d 1255 (6th Cir. 1995); *National Labor Relations Board v. United States Postal Service*, 8 F.3d 832 (D.C. Cir. 1993) (noting the difference between waiver and "covered by"); and *Chicago Tribune Co. v. National Labor Relations Board*, 974 F.2d 933 (7th Cir. 1992)[4] .

Under the "contract coverage" analysis, the fact that the contract "covers" a subject in general terms indicates that the parties exercised their rights to bargain over that area. The District maintains that while the collective bargaining agreement does not specifically give it the right to reduce hours, the fact that the agreement allows it to lay off employees upon notice to the Union "covers" its right to reduce hours after giving notice.

As the Board noted in its opinion, the "clear and unmistakable" standard has been approved by the Illinois courts. See *Central City Education Ass'n*, 149 Ill. 2d at 530 (waiver in a collective bargaining agreement must be established by clear and express contract

---

[4] In that case, the court of appeals questioned the "force" of the "clear and unmistakable" principle in the face of the Supreme Court's determination that even a waiver of constitutional rights need not be proven by clear and convincing evidence. *Chicago Tribune Co.*, 974 F.2d at 936-37. In any event the court determined that the management-rights clause gave management the exclusive right to establish reasonable regulations relating to employee conduct and allowed it to regulate off-the-job conduct as well as on-the-job conduct, as the two could be related and thus within the scope of the clause. *Chicago Tribune Co.*, 974 F.2d at 937.

language). The National Labor Relations Board specifically has declined to apply the "covered by" test to an alleged failure to bargain. See *Exxon Research & Engineering Co.*, 317 N.L.R.B. 675 (1995).[5] Recent decisions of the Board have utilized the "clear and unmistakable language" test. See *Chicago Park District*, 18 Pub. Employee Rep. (Ill.) par. 3036, Nos. L—CA—00—056, L—CA—01—040 (ILRB Local Panel November 25, 2002); *Metropolitan Alliance of Police, Bensenville Police Chapter 165*, 19 Pub. Employee Rep. (Ill.) par. 119, No. S—CA—02—077 (ILRB State Panel June 26, 2003).

The District also argues that the Board erred in failing to construe the Agreement as a whole. Under the "Entire Agreement" clause, the parties are not required to bargain over matters not included in the Agreement "except as may otherwise be required by law." Inasmuch as section 4 of the Act requires the parties to bargain over the reduction in hours, the "Entire Agreement" clause does not support the District's argument.

The question to be determined then is whether the agreement contains "clear and unmistakable language" evidencing the parties' intention to waive the right to bargain over a reduction in employee hours.

As was previously noted, in *AFSCME*, the court found that the employer's right "to relieve employees from duty" waived its right to bargain over the employer's decision to lay off employees. There was no reference to a corresponding right to reduce employee hours. Therefore, *AFSCME* does not support the District's argument.

The District also argues that its right under the Agreement to change employee hours permitted it to reduce hours and therefore waived the Union's right to bargain.[6] The District observes that prior cases have noted that " '[a] grudging or stilted interpretation of collective bargaining agreements tends to encroach upon the fundamental national policy favoring the ordering of the employer-employee relationship by voluntary bargaining rather than governmental fiat, [citation]; it injects into the collective bargaining process an uncertainty that diminishes the prospects for successful bargaining. [Citations.]' [Citation.]" *East Richland Education Ass'n v. Illinois*

---

[5]Subsequently, enforcement was denied in that case, but the court did not reach the waiver issue. *Exxon Research & Engineering Co. v. National Labor Relations Board*, 89 F.3d 228, 232 (5th Cir. 1996).

[6]The Union maintains that sections 19.1 and 19.5 of the Agreement allowing the District to make changes in the workweek and workday schedule apply only to full-time (monthly) employees, because section 19.02 defines the normal work week as five consecutive days and the normal work day as eight hours. However, section 19.2 also states "for all employees."

*Educational Labor Relations Board*, 173 Ill. App. 3d 878, 908-09, 528 N.E.2d 751 (1988); see also *Water Pipe Extension v. City of Chicago*, 195 Ill. App. 3d 50, 65, 551 N.E.2d 1324 (1990).

In *Control Services, Inc.*, 303 N.L.R.B. 481 (1991); *order enforced*, *N.L.R.B. v. Control Services, Inc.*, 961 F.2d 1568 (3rd Cir. 1992), the collective bargaining agreement provided that " 'Nothing contained in this agreement shall be deemed to constitute a guarantee of any particular number of hours, or any particular days of work per week for any employee' " and that " 'the Company has the unqualified right to schedule hours of employment ... [or] to relieve employees of duties because of lack of work.' " *Control Services, Inc.*, 303 N.L.R.B. at 483.

The National Labor Relations Board (NLRB) rejected the respondent-company's argument that it was therefore contractually entitled to reduce employees' hours of work and consequently their wages and benefits. Noting that waivers of statutory rights must be "clear and unmistakable," the NLRB determined that the fact that the employees were not "guaranteed" any particular number of hours meant exactly that and could not be interpreted to mean that the union locals had waived their rights to bargain over the changes in the number of hours to be worked. *Control Services, Inc.*, 303 N.L.R.B. at 484.

We conclude that the proper test to be applied is the "clear and unmistakable language" test, and that under that test, the Union did not waive its right to bargain over the reduction in employees' hours.

### III. Refusal To Bargain

#### A. *Standard of Review*

■ An agency's findings of fact are held to be *prima facie* true and correct and must be upheld unless they are against the manifest weight of the evidence. *City of Belvidere*, 181 Ill. 2d at 204. " 'The manifest weight of the evidence is that which is "the clearly evident, plain and indisputable weight of the evidence." [Citations.] In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. [Citation.]' [Citation.]" *Drogos v. Village of Bensenville*, 100 Ill. App. 3d 48, 54, 426 N.E.2d 1276 (1981).

#### B. *Discussion*

■ The District contends that the Board's factual determination that it refused to bargain the reduction-in-hours issue with the Union is against the manifest weight of the evidence.

In its order, the Board concluded that the record evidenced a clear

refusal to bargain on the part of the District. The Board specifically noted that while Mr. Rose initially agreed to bargain over the 2002 reductions and was processing the Union's request for information, he thereafter informed Ms. Rodriguez that the District was standing by its position in the 2001 case and did not have to bargain over the reduction in hours. The District's refusal to bargain was further established by Mr. Rose's letter to Ms. Rodriguez, in which he stated that the District's position on formal negotiations as to the hours reduction was consistent with its position in the 2001 case.

The District argues that Mr. Rose never refused to negotiate. The District points out that the Board adopted the ALJ's findings of fact and conclusions of law and notes that the ALJ merely found that Ms. Rodriguez could have misinterpreted what Mr. Rose said in their December 19, 2001, telephone conversation.

However, the ALJ specifically rejected Mr. Rose's denial that the District had refused to bargain with the Union. In a footnote to her decision, the ALJ stated as follows:

"Rose testified that he never said to Rodriguez that he would not negotiate over the reduction in hours. However, given his statement to her that the [District] maintained its position that the hours reduction did not concern a mandatory subject of collective bargaining, it was reasonable for Rodriguez to interpret that statement as, in effect, a statement that the [District] would not negotiate. For this reason, I reject Rose's testimony that he never said that the [District] would not negotiate the reduction in hours."

The Board's finding that the District refused to bargain over the reduction in hours is supported by the record in this case, and the opposite is not clearly apparent.

We conclude that the Board's finding that the District refused to bargain over the reduction-in-hours issue was not against the manifest weight of the evidence.

For all of the foregoing reasons, we affirm the order of the Board.

Affirmed.

HOFFMAN, P.J., and SOUTH, J., concur.