In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 16-2080 & 16-2026

COLUMBIA COLLEGE CHICAGO,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

Petition for Review and Cross-Application for Enforcement of an
Order of the National Labor Relations Board.
Nos. 13-CA-073486, 13-CA-073487, 13-CA-076794,
13-CA-078080, 13-CA-081162, 13-CA-084369

ARGUED NOVEMBER 29, 2016 — DECIDED FEBRUARY 2, 2017

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Petitioner Columbia College Chicago ("Columbia") seeks review of a National Labor Relations Board ("NLRB") order. The order required Columbia to engage in "effects bargaining" with the Part-Time Faculty Association at Columbia College Chicago ("PFAC") under the terms of the parties' collective-bargaining agreement ("CBA") regarding credit-hour changes to Columbia's performing-arts

curriculum, and awarded bargaining expenses to PFAC. We grant Columbia's petition for review, and grant in part and deny in part the NLRB's application for enforcement. We thus enforce in part and vacate in part the Board's order, and remand for further proceedings.

## I. Background

Columbia is a private, independent college that specializes in communication, media, and the arts. Since 1998, PFAC has served as the exclusive collective-bargaining representative for part-time faculty at Columbia, of which there were over 1,200. PFAC and Columbia were parties to a CBA that, by its terms, was in effect from 2006 to August 31, 2010. The parties agreed to keep the 2006 CBA in place while they bargained for a successor agreement, and so the former was in effect at all times relevant to this case.

The CBA contained several provisions that are pertinent to this appeal. First, the agreement had a management-rights clause permitting Columbia to make decisions about its educational, fiscal, and employment policies without first having to bargain with PFAC:

> Columbia … retain[s] all … rights … inherent in the management of [Columbia] … except as specifically modified by this Agreement during its term. All the rights and responsibilities of Columbia … shall be retained and exercised in [its] sole discretion including by way of example and not in any way limited to:
>
> > A. The right to plan, establish, terminate, modify, and implement all aspects of educa-

tional policies and practices, including curricula; admission and graduation requirements and standards; scheduling; … and the … reduction, modification, alteration … or transfer of any job, department, program, course, institute, or other academic or non-academic activity and the staffing of the activity, except as may be modified by this Agreement.

B. The right to manage [Columbia] and direct [Columbia's] property, including fiscal and budgetary policy …, except as may be modified by this Agreement.

C. The right to … establish, modify, and discontinue rules and regulations … relating to the performance of work, including workload, scheduling of work and its location …, except as may be modified by this Agreement.

Second, the CBA determined part-time faculty pay using two main variables: the number of credit hours a course carried and the total number of credit hours the faculty member had previously taught. The agreement contained a minimum-compensation schedule for three-credit-hour courses and provided that "[c]ompensation for courses totaling other than three credits shall be prorated" accordingly. Minimum compensation for a given course increased as faculty accumulated credit hours from prior semesters. The CBA required Columbia to notify the instructor of a given course of any significant changes to the course.

Finally, a section entitled "Entire Agreement," also known as a "zipper clause," stated:

> The parties acknowledge that during the nego-
> tiations which resulted in this Agreement, each
> had the right and opportunity to make demands
> and proposals on any subject or matter … and
> that the understandings and agreements ar-
> rived at by the parties after the exercise of that
> right and opportunity are set forth in this, the
> sole Agreement between the parties regarding
> wages, hours, and other terms and conditions of
> employment.

By January 2010, PFAC and Columbia had begun negoti-
ations for a successor CBA. The parties met weekly and kept
a running list of contract items that were not in dispute and
about which the parties planned to agree.

In the spring of 2010, Columbia administrators reevalu-
ated the school's curriculum. As part of that process, Colum-
bia unilaterally decided to reduce the credit hours for ten
courses in its School of Fine and Performing Arts, with the
changes to take effect in the 2011–2012 academic year. Colum-
bia notified part-time faculty members affected by these
changes, but not PFAC.[1]

In July 2010, PFAC filed an unfair-labor-practice charge re-
garding Columbia's refusal to bargain over the effects of its
decision to reduce course credit hours in the Photography De-
partment—a different department from the ones at issue in
this case. The parties settled that charge on October 22, 2010.[2]

---

[1] The 2006 CBA did not require Columbia to notify PFAC of such
changes, only the individually-affected faculty members.

[2] As part of the settlement, Columbia agreed to bargain over the ef-
fects of changes to credit hours in the Photography Department, and not

Meanwhile, the negotiations over the successor CBA were still ongoing, and on October 27, 2010, Columbia sent PFAC a proposal that included a modified management-rights clause. The modified clause was similar to the 2006 clause, but proposed new language extending the clause to explicitly waive PFAC's right to bargain over the effects or impact of Columbia's management decisions. On October 29, PFAC expressed concern about the proposed modification.

On March 30, 2011, Columbia submitted a new, comprehensive CBA proposal to PFAC. The document included the additional management-rights-clause language that Columbia had proposed in October 2010. In October 2011, after further negotiations, Columbia resubmitted its March 2011 proposal to PFAC. PFAC responded by saying that Columbia was engaging in regressive bargaining.

Negotiations broke down and stalled for several weeks. Then, on December 19, 2011, Columbia sent PFAC another revised contract, but with even stronger language in the management-rights clause, which was "intended to constitute a clear and unmistakable waiver of any rights [PFAC] might otherwise have to bargain over managerial rights and/or the effects or impact on unit members of [Columbia's] decisions with respect to such rights." (first alteration in original).

Around the same time, PFAC learned of the credit-hour reductions that Columbia had made in the spring of 2010. PFAC sought a list of affected courses from Columbia and demanded to bargain over the effects of the changes.

---

to violate the National Labor Relations Act "in any similar way" in the future. However, the parties do not argue that the settlement's non-violation provision impacts the current dispute.

On February 13, 2012, PFAC called for Columbia to resume face-to-face negotiations from the parties' bargaining positions as they had stood in October 2011. PFAC also stated that it would not consider Columbia's December 2011 proposal, which PFAC felt was regressive. On February 21, 2012, Columbia notified PFAC that the college did not believe it had an obligation to bargain with PFAC about the effects of course-credit-hour reductions. Nevertheless, Columbia provided a list of the impacted courses, and stated that it was willing meet to discuss the issue if PFAC would first give Columbia a proposal regarding the effects, and a list of PFAC members that had been affected by the changes to course credit hours. Similar exchanges followed in March and April 2012.

On May 4, 2012, Columbia agreed to meet and discuss the credit-hour reductions, and the parties resumed face-to-face negotiations in late June 2012. (PFAC did not allege that Columbia had engaged in bad-faith bargaining after this date.)

On August 28, 2012, the NLRB lodged a complaint against Columbia. The Board's consolidated complaint alleged, among other things, that Columbia had violated Sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1), (5), by failing to bargain: 1) over the effects of the credit-hour reductions from February to May 2012; 2) for a successor CBA from February to June 2012; and 3) in good faith with PFAC.

On March 15, 2013, after a full hearing, the Administrative Law Judge ("ALJ") issued his recommended decision and order. He concluded that Columbia had failed to engage in effects bargaining, had failed to adequately negotiate for a successor CBA, had set illegal preconditions to bargaining, and

had demonstrated bad-faith bargaining in its overall behavior. However, the ALJ declined to award special remedies, including reimbursement of PFAC's bargaining expenses, noting, "I cannot find … that [Columbia's] misconduct was so aggravated as to infect the bargaining process to the point where traditional remedies would not be effective." Columbia, PFAC and the NLRB each filed exceptions to the ALJ's decision.

On March 24, 2016, the NLRB, through a divided three-member panel, issued its decision and order. The NLRB agreed that Columbia had failed to engage in effects bargaining, set unlawful preconditions to bargaining, and negotiated in bad faith. Noting the absence of objections, the NLRB also adopted the ALJ's findings on Columbia's failure to adequately bargain over a successor CBA.[3]

However, the NLRB disagreed with the ALJ regarding remedies, and awarded bargaining expenses. The NLRB ordered Columbia to compensate PFAC for efforts to initiate effects bargaining from February 21, 2012, to May 4, 2012, and in connection with bargaining for a successor contract from March 31, 2012, to June 13, 2012.

---

[3] The NLRB likewise adopted the ALJ's findings regarding several allegations not at issue in this appeal, including Columbia's failure to provide information on its professor-evaluation system, misconduct toward a PFAC negotiator and Columbia faculty member, and maintenance of an overbroad work rule. Columbia does not challenge any of these adopted findings. The NLRB further adopted the ALJ's dismissal of several allegations against Columbia, and the NLRB does not challenge this aspect of the order. We summarily enforce the unchallenged portions of the NLRB's decision and order. *E.g.*, *N.L.R.B. v. Alwin Mfg. Co.*, 78 F.3d 1159, 1162 (7th Cir. 1996); 29 U.S.C. § 160(e).

As to the governing standard for waivers of bargaining rights, the NLRB majority stated,

> We also reject our dissenting colleague's argument that [Columbia] had no duty to bargain over the effects of its decision to change course credit hours under the contract-coverage test endorsed by the District of Columbia Circuit and the Seventh Circuit. The Board has declined to adopt the contract-coverage standard and instead has consistently applied the "clear and unmistakable" waiver standard. See *Provena St. Joseph Medical Center*, 350 NLRB 808 (2007) .…

The dissenting panel member argued that Columbia had not violated the NLRA because the college had no duty to bargain over the effects of the credit-hour reductions. The dissent outlined three rationales for this conclusion: 1) the effects were the inevitable consequence of a permissible managerial decision under *Fresno Bee*, 339 NLRB 1214 (2003);[4] 2) under binding case law from this Court, the effects of the credit-hour reductions were already "covered" by the CBA and there was no indication that the effects should be treated separately from the decision itself; and 3) Columbia did not violate the NLRA even under the majority's version of the unmistakable-

---

[4] Under *Fresno Bee*, an employer has no duty to bargain over the effects of a permissible managerial decision if "the change resulted directly from that decision, [and] there was no possibility of an alternative change in terms of employment that would have warranted bargaining." 339 NLRB at 1214–15 (citing *Holly Farms Corp. v. N.L.R.B.*, 48 F.3d 1360, 1368 (4th Cir. 1995)).

waiver standard. The dissent concluded that bargaining expenses were inappropriately awarded. This appeal followed.

## II. Discussion

Though "we give substantial deference to both [the NLRB's] findings of fact and its interpretations of the [NLRA]," we must still "determine whether the Board's decision is supported by substantial evidence and whether its legal conclusions have a reasonable basis in law." *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 645–46 (7th Cir. 2012) (citations omitted). "We defer to the Board's interpretation of the [NLRA] unless its legal conclusions are irrational or inconsistent with the Act. Where a matter involves analysis of state law for which the Board has no special expertise, however, our review is de novo," including in matters of contractual interpretation. *Id.* at 646 (citations and internal quotation marks omitted). Additionally, courts "refuse[] enforcement of Board orders where they ha[ve] no reasonable basis in law, either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning." *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 497 (1979) (citation and internal quotation marks omitted).

The NLRB, in finding for PFAC, applied the "clear and unmistakable waiver" standard. However, as the NLRB's order recognized, when a binding CBA fully defines the parties' rights on the contested issue, we look only to the language of the agreement; the clear-and-unmistakable-waiver standard is irrelevant. *See Chicago Tribune Co. v. N.L.R.B.*, 974 F.2d 933, 937 (7th Cir. 1992). Because the NLRB chose to apply a stand-

ard that conflicts with this Court's precedents, we owe no deference to the NLRB's legal conclusions. *See Ford Motor Co.*, 441 U.S. at 497; *Roundy's Inc.*, 674 F.3d at 645–46.

### A. Contractual Waiver of Effects Bargaining

The NLRA allows employees to bargain collectively through a chosen bargaining representative. 29 U.S.C. § 157. An employer must bargain with the representative over significant changes in working conditions. *See id.* § 158(a)(5); *Contemporary Cars, Inc. v. N.L.R.B.*, 814 F.3d 859, 868 (7th Cir. 2016); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007). Statutory rights such as these may be waived by the bargaining representative, often "to secure gains it considers of more value to its members." *Metro. Edison Co. v. N.L.R.B.*, 460 U.S. 693, 707 (1983), Waivers of statutory rights must be "clear and unmistakable." *Id.* at 708.

Since *Metropolitan Edison*, this Court has determined that

> where the contract fully defines the parties' rights as to what would otherwise be a mandatory subject of bargaining, it is incorrect to say that the union has "waived" its statutory right to bargain; rather, the contract will control and the "clear and unmistakable" intent standard is irrelevant.

*Chicago Tribune*, 974 F.2d at 937 (quoting *Local Union No. 47 v. N.L.R.B.*, 927 F.2d 635, 641 (D.C. Cir. 1991)). The parties refer to this agreement-centric approach as "contract-coverage analysis."

This type of analysis applies to decisions taken by employers and to the *effects* of those decisions, unless the parties' collective-bargaining agreement contemplates treating effects separately from the decisions covered by the terms of the agreement. *Enloe Med. Ctr. v. N.L.R.B.*, 433 F.3d 834, 838–39 (D.C. Cir. 2005) ("Whether the parties contemplated that the collective bargaining agreement would treat the effects of a decision separately from the decision itself is just as much a matter of ordinary contract interpretation as is the initial determination of whether the agreement covers the matter altogether. It would be rather unusual, moreover, to interpret a contract as granting an employer the unilateral right to make a particular decision but as reserving a union's right to bargain over the effects of that decision. This is not to say that such an interpretation is inconceivable, but it would seem that there would have to be some language or bargaining history to support the proposition that the parties intended to treat the issues separately.").

Thus, under *Chicago Tribune*, the NLRB or reviewing court should first look to see whether the parties are subject to an agreement, such as a collective-bargaining agreement, that sets out their respective rights and responsibilities. If there is such an agreement, the adjudicating body should determine, using normal principles of contract interpretation, whether the agreement "fully defines the parties' rights as to what would otherwise be a mandatory subject of bargaining." 974 F.2d at 937. If it does, the court should apply the terms of the agreement to the facts of the case in deciding whether the employer has fulfilled its contractual obligations. Finally, if the bargaining representative argues that the employer was obligated to bargain over the effects of the employer's decision, the court should look to see whether the governing agreement

or the parties' bargaining history indicates an intent to treat effects bargaining separately from bargaining over the decision itself. *See Enloe Med. Ctr.*, 433 F.3d at 838–39.

In the absence of a CBA, credit-hour changes would likely be a mandatory subject of bargaining between the parties. However, in this case, PFAC and Columbia agreed to continue the terms of their 2006 CBA while negotiating a successor agreement. The 2006 agreement gave Columbia "sole discretion" to, among other things, "modify … all aspects of educational policies and practices," including the "modification [or] alteration … of any … course." Reducing the number of credit hours for a course constitutes a modification or alteration of that course. The management-rights clause thus fully defined the parties' rights with respect to course-credit-hour changes.[5]

Further, the agreement did not create a decisions-effects bargaining dichotomy. PFAC did not adduce bargaining-history evidence or point to contractual language showing that the parties intended to treat effects bargaining separately from Columbia's decision-making rights. To the contrary, Columbia had made many credit-hour changes in prior years, and PFAC had not demanded effects bargaining until the 2010 Photography Department lawsuit.[6] When PFAC first demanded to engage in effects bargaining over the credit-hour

---

[5] Columbia complied with its related contractual obligation to notify affected faculty members of impending significant changes to courses.

[6] The NLRB argues that the Photography Department settlement agreement's effects-bargaining provision indicates that PFAC did not waive its effects-bargaining rights. Columbia argues that years of unchallenged curriculum changes shows the opposite. While true that "[t]he failure to demand bargaining in the past, without more, does not waive that

reductions in this case, Columbia's initial rejoinder stated that Columbia did not have such a bargaining obligation.[7] Regarding the CBA's terms, the parties agreed both to tie part-time-faculty compensation to credit hours and to allow Columbia to unilaterally modify those hours, without engaging in separate effects bargaining for changes in faculty pay.

In sum, Columbia and PFAC bargained over their respective rights and duties, and agreed to a binding CBA. The terms of that contract gave Columbia the right to alter course credits—the subject area over which PFAC wanted to engage

_____

bargaining right forever," *N.L.R.B. v. Roll & Hold Warehouse & Distrib. Corp.*, 162 F.3d 513, 518 (7th Cir. 1998), such a failure is a good indication that the parties did not intend to separate decision bargaining from effects bargaining under *Enloe.* Further, the NLRB does not develop an argument as to why the Photography Department settlement agreement shows an intention to separate effects from decisions; the settlement's effects-bargaining provision could also be understood as a concession to PFAC to settle the dispute, and not as a wider indication of what the 2006 CBA meant. In fact, the notice to employees generated by the settlement is expressly limited to the effects of credit-hour changes "in the Photography Department." This settlement is not sufficient to demonstrate that the parties intended to treat the two types of bargaining separately.

[7] Additionally, Columbia twice attempted to insert explicit effects-bargaining waivers into the proposed management-rights clause during the 2010–2011 negotiations. PFAC argues that the correct interpretation of this bargaining posture reveals that Columbia never believed that it actually had obtained an effects-bargaining waiver from PFAC. However, the rejected modifications can also be understood as attempts by Columbia to clarify its pre-existing rights using exceedingly clear waiver language. In the context of the 2010 Photography Department lawsuit and the negotiations underlying this lawsuit, such a goal would have been understandable. This Court therefore declines to interpret these contract-modification attempts as definitive evidence of the parties' intent to treat effects bargaining and decision bargaining separately.

in effects bargaining. Further, the CBA did not indicate separate treatment of effects bargaining and decision bargaining. Therefore, Columbia was not under any further obligation to bargain with PFAC over the effects of the credit-hour reductions. The college had already satisfied its statutory bargaining duty on this issue when it negotiated and entered into the 2006 CBA.[8]

### B.  Bargaining Expenses

Columbia does not contest on appeal that it failed to adequately negotiate for a successor CBA in 2012. For "the vast majority of bad-faith bargaining violations," the traditional remedies of a bargaining order, "cease-and-desist order[,] and the posting of a notice[] will suffice to induce a respondent to fulfill its statutory obligations." *Frontier Hotel & Casino*, 318 NLRB 857, 859 (1995). However,

> [i]n cases of unusually aggravated misconduct, … where … substantial unfair labor practices have infected the core of a bargaining process to such an extent that their "effects cannot be eliminated by the application of traditional remedies," an order requiring the respondent to reimburse the charging party for negotiation expenses is warranted … .

*Id.* (quoting *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 614 (1969)).

---

[8] Because we decide that Columbia had no further duty to bargain under *Chicago Tribune*, we do not address whether the effects of the credit-hour reductions were inevitable consequences of a permissible managerial decision under *Fresno Bee*, 339 NLRB 1214, or whether Columbia would have succeeded under the NLRB's version of waiver analysis.

The NLRB awarded bargaining expenses to PFAC under this standard, partially relying on conduct that Columbia does not challenge on appeal, but also on Columbia's behavior during the effects-bargaining negotiations. Because we conclude that Columbia was not obligated to engage in such bargaining, we vacate the award of bargaining expenses and remand to the NLRB to decide whether such a remedy is still warranted in this case without considering the effects-bargaining behavior.

### III. Conclusion

For the foregoing reasons, we GRANT Columbia's petition for review, and GRANT in part and DENY in part the NLRB's application for enforcement of the Board's order. We VACATE the order's effects-bargaining and negotiation-expense components, summarily enforce the remainder, and REMAND for further proceedings consistent with this opinion.

HAMILTON, *Circuit Judge*, concurring. Judge Flaum's opinion for the court applies correctly this circuit's precedents on "effects bargaining." See, e.g., *Chicago Tribune Co. v. NLRB*, 974 F.2d 933 (7th Cir. 1992). The Board quite deliberately chose not to follow this circuit's precedents in this case, perhaps to set up a test case to resolve the circuit split on the "clear and unmistakable" standard for waiver on effects bargaining. See generally *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 709 (1983) (rejecting finding of waiver of union officials' rights under no-strike clause: "to waive a statutory right the duty must be established clearly and unmistakably").

There are strong arguments in favor of the Board's "clear and unmistakable" standard for waiver of bargaining rights on effects that management decisions have on employees. See, e.g., *Provena St. Joseph Medical Center*, 350 NLRB 808 (2007). Our different approach is settled law in this circuit, however. If this legal standard is to change, it will need to happen in a different forum.

On the remedial issue, even without the effects-bargaining issue, the Board's decision to impose a remedial award of negotiating costs had ample support. Columbia College has not even challenged the Board's findings that it violated the National Labor Relations Act by engaging in bad-faith bargaining, by failing to meet and bargain over a successor agreement for four months, by failing to provide the union with requested information, by harassing a union official and then threatening her with discipline when she complained about it, by discriminating against the same union official, by maintaining an overly broad policy on use of the college's computer network, and by setting an unlawful precondition to bargaining. Because the effects-bargaining issue was part of

the Board's calculus in using its remedial discretion, I agree we must remand the remedial issue to the Board. There was plenty of other egregious conduct by the employer here, however, and Judge Flaum's opinion leaves the Board ample discretion to impose that remedy again on remand.