2017 IL App (1st) 153015

No. 1-15-3015

Opinion filed February 1, 2017

THIRD Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| COUNTY OF COOK and the SHERIFF OF COOK COUNTY, | ) ) ) | Petition for Review of Decision and Order of the Illinois |
| Petitioners-Appellants, | ) ) | Labor Relations Board, Local Panel |
| v. | ) ) | September 29, 2015 |
| ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL, ROBERT M. GIERUT, CHAIRMAN, CHARLES E. ANDERSON, MEMBER, RICHARD A. LEWIS, MEMBER, MELISSA MLYNSKI, EXECUTIVE DIRECTOR, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 700, and ILLINOIS FRATERNAL ORDER OF POLICE, | ) ) ) ) ) ) ) ) ) | No. L-CA-14-016 |
| Respondents-Appellees. | ) ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Pucinski and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent-appellee International Brotherhood of Teamsters, Local 700 (Union)[1], the representative of three bargaining units of Cook County correctional officers, deputy sheriffs, and fugitive investigators[2], filed a charge with the Illinois Labor Relations Board (Board), alleging that petitioners-appellants, County of Cook and the Sheriff of Cook County ("Sheriff" or "the Employer"), committed an unfair labor practice by unilaterally changing their secondary employment policy and refusing to bargain over it when they issued a general order establishing new policies and procedures governing their employees' ability to work a second job.[3] In March 2013, the Board's administrative law judge (ALJ) conducted a hearing and issued a recommended decision and order (RDO) in which it concluded that the Employer violated certain sections of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a) (West 2014)), by unilaterally changing the criteria for obtaining approval to work a second job, establishing objective attendance and disciplinary criteria in reviewing and revoking previously authorized secondary employment, and requiring all employees to submit an annual secondary employment disclosure form. The Employer filed exceptions to that RDO. In September 2015, the Board upheld the RDO. The Employer appeals,

---

[1]The Illinois Fraternal Order of Police Labor Council (IFOPLC) is now the exclusive bargaining representative of all full-time employees of the County of Cook and Sheriff of Cook County, merit board classification of Deputy Sheriff (Court Services, Unit I). This bargaining unit was Board certified on August 29, 2014, is an appellee here, and filed an appeal brief with this court. The unfair labor practice charge in this case was filed by the previous bargaining unit, the International Brotherhood of Teamsters, Local 700, when it was the bargaining representative for deputy sheriffs, corrections officers, and fugitive officers. The Teamsters were the exclusive bargaining representative for these groups at the time of the filing of the charge and at the time of the hearing. The Teamsters, Local 700, continue to represent the bargaining units of corrections officers and fugitive officers. For clarity, we refer to the IFOPLC and the Teamsters, Local 700, collectively, as "Union" herein.

[2]There are approximately 3,000 Correctional Officers, 800 Court Services Deputies, and 20 Fugitive Investigators.

[3]In May 2015, the IFOPLC filed a motion with the Board to intervene in this matter. The motion was granted.

contending the Board's decision must be reversed because the new secondary employment policy is not subject to bargaining, as it is within the Employer's inherent managerial authority; the new secondary employment policy does not change hours, wages or conditions of employment; and the new secondary employment policy does not impose new discipline on employees. The employer also contends the complaint should be dismissed because the Union was not denied the opportunity to bargain over the issue of secondary employment. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        The Union and the Employer are parties to a collective bargaining agreement. That agreement provides that "each employee will operate within the department's secondary employment policy's guidelines."

¶ 4        On December 4, 2007, the Sheriff's Office issued Cook County Sheriff's Order General Order 07-02 (prior General Order), which established the policy and procedures related to secondary employment by all Sheriff's Office sworn and civilian employees. This prior General Order addressed various topics, including the procedures by which the head of an employee's department would review and could grant approval to work a second job, as well as the circumstances in which secondary employment was prohibited. The Union later entered into collective bargaining agreements (CBA) for the three bargaining units composed of correctional officers, deputy sheriffs, and fugitive investigators. The CBA incorporated the prior General Order, providing that employees must comply with the existing secondary employment policy.

¶ 5        The Collective Bargaining Agreements between the Employer and the various parties represented by the Union are included in the record on appeal. Each contains a provision,

entitled "Secondary Employment," stating that each employee will operate within the department's secondary employment guidelines.

¶ 6      The Deputy Sheriffs' agreement contains the following provision:

"Section 3.5 Secondary Employment:

It is understood between the parties that employment with the Cook County Sheriff's Office is the employee's primary job. In all instances, the employee will operate within the guidelines of the department General Order, regarding secondary employment in effect at the time of this Agreement.

Employees engaged in secondary employment with permission shall be allowed to work unlimited hours as long as these hours do not affect the employee's ability to perform his assignments with the employer. Once allowed, secondary employment shall not be terminated except for just cause.

A request for secondary employment shall be denied, under the following circumstances, when the secondary employment is in an establishment where the primary business is the sale of intoxicating liquor or gambling:

1. The employment includes serving as a bartender and/or dispensing intoxicating liquor.

2. The employment includes serving as a cocktail waiter/waitress.

3. The employment is security related.

4. The Sheriff's Office deems that the employment will bring discredit upon the department."

¶ 7     The Collective Bargaining Agreement between the Employer and the fugitive unit investigators contains the following provision:

> "Section 12.8 Secondary Employment Permitted:
>
> The employer may require advance written request for secondary employment, in accordance with existing Department policy, which may only be denied for just cause. Only employees working in the capacity of a law enforcement officer, security guard or investigator may be required to furnish proof of the secondary Employer's indemnification/liability insurance coverage. This provision shall not apply to work performed for the County of Cook or the Cook County Sheriff's Department.
>
> There shall be no fixed limit on the number of hours an employee may work at secondary employment as long as the secondary employment does not interfere with the employee's ability to perform his job duties for the County."

¶ 8     The Collective Bargaining Agreement between the Employer and Correctional Officers includes the following provision:

> "Section 13.15 Secondary Employment:
>
> It is understood that employment with the Cook County Sheriff is the Employee's primary job. In all instances the employee will operate within the guidelines of the Department General Order, where the employee is assigned, regarding secondary employment. Employees working in the capacity of law enforcement officer, security guard or investigator shall furnish proof of the secondary employer's indemnification/liability insurance. Employees engaged in secondary employment with permission shall be allowed to work unlimited hours as long as these hours do

not affect the employee's ability to perform his assignments with the employer. Once allowed, secondary employment shall not be terminated except for just cause.

A request for secondary employment shall be denied, under the following circumstances, when the secondary employment is an establishment where the primary business is the sale of intoxicating liquor or gambling and:

1. The employment includes serving as a bartender and/or dispensing intoxicating liquor;

2. The employment includes serving as a cocktail waiter/waitress;

3. The employment is security related and prior permission is not granted; and

4. The Sheriff's Office deems that the employment will bring discredit upon the department."

¶ 9      The parties began negotiating a Unit 2 (corrections officers) successor CBA in 2011, and continue to negotiate the terms of the successor agreement. During these negotiations, the Union proposed that any reference to a General Order be removed from the secondary employment provision of the existing CBA and that the secondary employment policy stem solely from the text of the successor CBA. Prior to August 2013, neither party specifically addressed the contents of any General Order applicable to secondary employment. Negotiation for a Unit 1 (deputy sheriffs) successor CBA are ongoing. The parties have not begun to negotiate a Unit 3 (fugitive officers) successor CBA.

¶ 10     On or about July 8, 2013, the Employer issued Sheriff's Order 11.4.55.0 (Sheriff's Order 1), a new general order setting guidelines for secondary employment. The Union—believing this Order imposed new provisions and requirements on employees, presented new opportunities for discipline, and contradicted and supplemented existing collective

bargaining language—sent an email and letter demanding to bargain the change and its effects. The email was dated July 12, 2013, and the letter was dated July 11, 2013. Both dates were prior to the August 1, 2013, effective date of the new General Order. A facsimile confirmation shows that the Sheriff's office received the demand to bargain letter prior to the effective date. The Employer did not respond to the demand. The Employer did not offer to bargain, but on or about July 23, 2014, it rescinded Sheriff's Order 1 and replaced it with Sheriff's Order 11.4.55.1 (new General Order). This Order was identical to Sheriff's Order 1 except for one date change. All of the issues with which the Union took issue in Sheriff's Order 1 were still present in the new General Order. The Union again demanded to bargain. The Employer again did not respond. The new General Order became effective August 1, 2013. The secondary employment policy in the new General Order differs from the prior General Order, in part, in that: (1) all employees are required to submit annual paperwork regarding their intent to seek or not to seek secondary employment, whereas under the prior General Order, only those seeking secondary employment were required to submit secondary employment paperwork; and (2) whereas the prior General Order provided that an employee's attendance and disciplinary history would be considered in deciding whether to revoke a previously-granted approval for secondary employment, the new General Order entirely prohibits secondary employment in certain circumstances based on those factors. In this appeal, the Union argues that these guidelines were new and should have been bargained for, while the Employer argues that they were not, in fact, new and were not subject to bargaining.

¶ 11        The new General order provided conditions under which secondary employment approval may be withheld or revoked:

- 7 -

"A. Secondary Employment may be denied or revoked when an employee:

* * *

(3) Has incurred one (1) or more instances of an unauthorized absence in the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests;

(4) Has incurred four (4) or more instances of documented tardiness for duty in the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests. For purposes of this Order, an instance of documented tardiness is defined as when the employee timecard has been coded "Tardy."

(5) Has been on Proof Status within the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests;

(6) Has received discipline from his/her original Department or from OPR resulting in a suspension of a total of three (3) or more days for a single infraction that occurred within the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests."

¶ 12        Additionally, the new General Order imposed an annual disclosure requirement for officers who do not intend to work secondary employment in the upcoming year:

"A. All [Cook County Sheriff's Office ("CCSO")] employees must complete and submit a Secondary Employment Disclosure Form, through his/her chain of command, indicating whether or not he/she works Secondary Employment on an annual basis pursuant to this Order beginning October 1, 2013 and each October 1st

thereafter. The deadline for submittal of all Secondary Employment Disclosure Forms is October 1st."

The previous General Order imposed a disclosure/approval requirement only for those officers who desired to work a second job in the upcoming year, rather than requiring that all employees do so, providing:

> "Prior to accepting or commencing any secondary employment, permission must be obtained through the chain of command from the Department Head."

¶ 13       On August 15, 2013, the Union filed an unfair labor charge with the Board. By that charge, the Union alleged the Employer committed an unfair labor practice by unilaterally changing the secondary employment policy and refusing to bargain over it when it issued the new General Order establishing new policies and procedures governing employees' ability to work a second job. Specifically, the Union alleged that the Employer violated Sections 10(a)(4) and (1) of the Act when it unilaterally implemented the new General Order regarding secondary employment without bargaining with the Union, even though the new policy was a fundamental change to the hours and working conditions, making it a mandatory subject of bargaining. The charge alleged that the Union-represented workers were subject to collective bargaining agreements that "contain comprehensive negotiated language governing secondary employment" and stated, in part:

> "2. All such employees [represented by the Union] must comply with Sheriff's General Orders governing secondary employment. Historically, they were to follow the directives in General Order 07-2, which was incorporated by reference into the collective bargaining agreements attached hereto. Additionally, the collective bargaining agreements contain comprehensive negotiated language governing

- 9 -

secondary employment. Between GO 07-2 and the language in the agreements, a fully negotiated set of rules governing secondary employment existed. ***

3. On or about July 8, [2013], the Union was given notice of a new General Order, 11.4.55.0, governing secondary employment that contained much language outside of the negotiated provisions in the CBAs and the old GO 07-2. For example, the new GO requires all employees to disclose on an annual basis whether or not they are secondarily employed, subject to discipline for failing to do so. In addition, the new GO imposes new stringent limitations on the kind of secondary employment that employees may pursue. These are just a few examples. ***

4. On July 12, 2013, the Union demanded to bargain over the new General Order 11.4.55.0 by sending a letter via mail, fax and email to the Sheriff's General Counsel, Peter Kramer. To date, no response has been had to the demand to bargain. ***

5. On August 1, 2013, the Sheriff rescinded General Order 11.4.55.0 and enacted General Order 11.5.55.1, again regarding secondary employment. Both General Orders are largely the same, with only minor changes to dates and additions to protocol appearing in 11.4.55.1. ***

6. The Union again demanded to bargain over the new General Order 11.4.55.1 by sending an email so noting to the Sheriff's General Counsel, Peter Kramer. ***

7. To date, the Union has received no response to any of its demand to bargain letters, nor permitted an opportunity to bargain over the changes to the secondary employment procedures.

8. Sheriff's Order 11.4.55.1 is a material and substantial policy change regarding secondary employment. The policy substantially departs from the comprehensive

- 10 -

contractually-negotiated limitations and procedures regarding secondary employment. The policy also rescinds General Order 07-2, which is incorporated by reference into the collective bargaining agreements, meaning the Sheriff has unilaterally rescinded part of the agreements.

9. Sheriff's Order 11.4.55.1 is a fundamental change to the hours and working conditions of the employees it covers and is a mandatory subject of bargaining. ***

10. By failing to give advance notice and an opportunity to bargain over 11.4.55.1 with the Union, the Sheriff has violated Sections 10(a)(1) and 10(a)(4) of the Act."

After the charge was investigated, the Board's Executive Director issued a complaint.

¶ 14 The Administrative Law Judge (ALJ) held a three-day hearing on the matter, spanning June 4, 5, and July 22, 2014.

¶ 15 At the hearing, Cook County Sheriff's Office Special Counsel for Labor Affairs Peter Kramer testified that he oversees all contract negotiations, grievances, and arbitrations at the office. At the time of the hearing, there were current negotiations taking place, he had met with the represented groups in contract negotiations on numerous occasions, and the new secondary employment had "come up as issues of negotiation," although nothing had yet been determined. According to Kramer, the Sheriff did not refuse to bargain over new secondary employment regulations. Kramer testified the various represented groups had not agreed on what proposal would be reasonable.

¶ 16 Kramer explained that the new General Order, Section XI, requires that all employees sign a form regarding whether they had secondary employment and that there is a central depositor and therefore a control on everybody signing and having a form. He explained that subparagraph E requires all employees to fill out the form, and if the form is not filled out

after the employee is warned three times, then the employee can be disciplined. Both the previous General Order and the new General Order have specific restrictions and limitations on secondary employment, and the new General Order contains clarification on instances in which secondary employment can be denied.

¶ 17    Kramer testified he did not see any differences in practice with respect to the old General Order and the new one. He did not believe that the new General Order increases the chances an employee might be disciplined as opposed to the old General Order, saying, "it's just as probable there could be less discipline." He agreed that, "according to the [old] GO," the practice of the Sheriff prior to July 2013 was that only those who worked secondary employment had to fill out a form, and that, also prior to July 2013, an employee would not have been subject to discipline for not submitting documentation regarding secondary employment if he did not work secondary employment. Under the new policy, however, regardless of whether an officer had secondary employment, he would be subject to discipline if he failed to complete the secondary employment form.

¶ 18    Kramer testified that the new General Order increases the Sheriff's ability to enforce secondary employment regulations. He explained that there have been problems when, for example, an employee "was doing something they were not supposed to be doing, working somewhere they weren't supposed to be working or working there when they were supposed to be at work at our [the Cook County Sheriff's] job, which is the primary place of employment." These situations would result in the Sheriff's Office reviewing the employee's file to determine whether the employee had approval to work secondary employment. Frequently, however, the employee would allege that he had submitted the paperwork to a supervisor, and the employee would not "know what [the supervisor] did with [the

- 12 -

paperwork] after that." This would then result in an investigation as to whether the employee did in fact submit the required documentation for approval, bogging down the Sheriff's ability to enforce the Order and requiring the employee to prove he did not fail to obtain approval from the supervisor.

¶ 19    Kramer confirmed he did not respond to Union emails about negotiating over the new policies.

¶ 20    Additionally, Kramer explained that "proof status" is a term of art regarding employees who have attendance-related issues, such as using unauthorized time or taking sick days in a discernible pattern. He agreed that the prior General Order did not state as a possible condition for denial or revocation of secondary employment that an officer "[h]as been on proof status within the previous 12 months." Additionally, Kramer agreed that the new General Order states that a suspension of a total of three or more days for a single infraction that occurred within the prior 12 months could be a basis for denial or revocation of secondary employment, while the prior General Order did not.

¶ 21    Kevin Camden, general counsel for Teamsters Local 700, testified that he is the lead bargainer for the Department of Corrections [DOC], and is personally involved in negotiations for the Court Service Unit and Fugitive Units. According to Camden, who attended all of the local bargaining sessions of the DOC, the Sheriff's office never presented an updated General Order regarding secondary employment in any of the bargaining sessions. He also agreed that the Sheriff's office never "verbalized during those negotiations that they would be updating the secondary employment General Order and would be negotiating over that with us." He testified that, around July 2013, the union steward forwarded him an email indicating that the new General Order might be issued soon. When

- 13 -

asked whether, after reviewing the proposed General Order, he determined that it contained any changes to the previously existing General Order, Camden responded:

> "[WITNESS CAMDEN:] A. Yes. The most critical change would be the annual requirement, and then subordinate to that, filing a form that says you don't have secondary employment. That was a radical change from the prior policy, as well as the application."

¶ 22    Camden was also concerned about an increase in discipline stemming from the new policy. He explained that his office had "had a fair number of cases for allegations of secondary employment violations since we became the bargaining agent in 2009." He described a "change historically in the way secondary employment was handled" when the Sheriff changed from the Sheahan administration to the Dart administration. He said:

> "[WITNESS CAMDEN:] A: *** I'm rather familiar with [the way secondary employment was handled when the administration changed] because I tried several grievances, including the Albert Stubenvoll grievance, where there was record evidence to indicate under the [Sheahan] administration, your secondary employment—you would not get approval if it was employed [*sic*], you would only get a denial.
>
> When Tom Dart was elected Sheriff, that policy started to change, but there was still a fair number of officers, for example, that had been working secondary, assumed that it had been approved under the Sheehan [*sic*] administration and then discipline came down from Sheriff Dart alleging that they didn't have the appropriate approval.
>
> The Stubenvoll case involved a 15-year [correctional officer], now a sergeant *** that had been disciplined for working secondary employment, even though his

- 14 -

secondary employment was denied but there was a 90 or 120-day *** gap between the time he submitted his application and when he received his denial.

Based on the record evidence, as well as the fact that he had no discipline, the Arbitrator rescinded his 3-day suspension that he was given.

But the issue that came out of that case was the change in the practice not even regarding this proposed General Order, 11.4.55.0, but the prior version with respect to approval or denial."

¶ 23    Counsel then asked Camden:

"[UNION COUNSEL CASPER:] Q. Okay. So are you stating that based upon the change in secondary employment policy between the Sheahan administration and the Dart administration, based upon your experience and the increased discipline during that change, you expected discipline to increase[] under a new proposed July 13th change?"

Camden answered:

"[WITNESS CAMDEN:] A. I was confident that there would have been increased discipline because there was now the additional requirement that officers were going to be required to submit forms stating that they did not have secondary employment.

I'm not a particularly sophisticated person, but this seemed like a make-work project to me. And at the time that this would have come down, the Office of Professional Review or whatever it may have been called at the time, was ridiculously backlogged in dealing with disciplinary cases.

The last thing I thought we needed to deal with on the compound in the midst of a staffing issue, for lack of sufficient staff at the DOC, was forms to indicate you did not have secondary employment. I found it to be an utter waste of time."

¶ 24    In Camden's opinion, the secondary employment portion of the new General Order had the potential to both increase discipline and increase the number of officers subject to Office of Professional Review investigation. Camden testified he thought it was "poor form" for the Sheriff to implement a new policy without dialogue with the Union. He testified there were no discussions with the Employer between July 1, 2013, and August 1, 2013, regarding the new policy. Camden does not recall Kramer ever contacting him after Kramer received the Union's demand to bargain letter. It is Camden's opinion that "[i]f the Sheriff is proposing a change in [the] General Order and that somehow impacts the wages, hours or terms and conditions of employment for this bargaining unit ***, the Sheriff has an obligation, if requested by the Union *** to engage in impact or effects bargaining."

¶ 25    Jonathan Myslinski, the assistant director of the Investigations Unit of the Cook County Sheriff's Department Office of Professional Review (OPR) also testified. The OPR investigates misconduct complaints regarding its employees. Myslinski agreed that the new General Order created a new requirement for employees, whether or not they are working secondary employment, stating:

> "[TEAMSTERS ATTORNEY CASPER:] Q. You would agree with me that this General Order *** created a new requirement that Sheriff's Office employees disclose if they're not working secondary employment by October 1st of each year; correct?
>
> [WITNESS MYSLINSKI:] A. Correct.

- 16 -

Q. That had never been a policy before; correct?

A. Correct."

¶ 26    Myslinski also agreed that an employee who fails to submit the required form stating whether or not he is working secondary employment could be disciplined on a number of levels, stating:

"[TEAMSTERS ATTORNEY CASPER:] Q. All right. And you would agree with me that if an employee fails to complete that form, he could possibly be subject to investigation by OPR; is that correct?

[WITNESS MYSLINSKI:] A. Correct.

Q. And OPR, if they found that the employee failed to meet that requirement, they could recommend discipline; correct?

A. Correct.

Q. And OPR is not the only potential investigatory body in the Cook County Sheriff's Office, the employee's chain of command can also investigate an employee for misconduct; correct?

A. Correct.

Q. And if an employee's chain of command found that the employee failed to complete the disclosure form by October 1st of each year, the chain of command can recommend discipline, correct?

A. Correct."

¶ 27    Myslinski agreed that an employee could have his secondary employment revoked or denied based on one or more unauthorized absences, such as a "no vacation day," a "no sick

day," an unauthorized leave day, or a "no personal time" day. He testified that "to the best of [his] knowledge," this was a new condition of revocation or denial under the new General Order. In addition, under the new General Order, an employee who incurs 4 or more instances of documented tardiness for duty in the previous 12 months can have his secondary employment denied or revoked. Myslinski testified that this, too, was a new requirement under the new General Order. Another new requirement under the new General Order, according to Myslinski, is that an employee suspended three or more days can have his secondary employment denied or revoked.

¶ 28      Cook County Corrections Officer Mark Robinson testified he was the Chief Union Steward at the Department of Corrections (DOC). His main duties as steward are maintenance of grievances, arbitrations, distributing information, and dealing with Union arbitrations. Robinson testified that, prior to the new General Order, an officer who was caught working secondary employment who had not notified the Employer about the employment could be disciplined. Also prior to the new General Order, an officer in the Department of Corrections who did not work secondary employment and did not fill out any paperwork to that effect would not be disciplined. The disclosure requirement changed with the new General Order, however, and all employees are now required to notify the DOC of their intention to work or not to work secondary employment. Employees can be subject to discipline for failure to complete the annual paperwork. In Robinson's opinion, the new General Order presents new opportunities where employees could be disciplined. He explained that this is particularly true simply because employees are now required to fill out the additional annual disclosure paperwork, which could potentially get lost in the system. According to Robinson, the Union was involved in the instant litigation because the

employer unilaterally issued a new policy changing secondary employment, implemented it, and never bargained with the Union prior to that implementation, and, after it was implemented, employees could immediately be disciplined under the new policy.

¶ 29     Cook County Sheriff's Office Deputy Sheriff Michael Harrington testified he was currently detailed as the Teamsters Local 700 Assistant Chief Union Steward. In this capacity, Harrington argues grievances, handles scheduling for OPR cases when individuals are summoned to the Sheriff's office for professional review, and other duties. Harrington testified that, prior to the new General Order, an employee could get approval for secondary employment by submitting a one-page application. At that time, there was no paperwork necessary if an employee did not want to work secondary employment. With the new General Order, however, every employee must submit secondary employment information, whether they intend to engage in secondary employment or not. To Harrington's knowledge, no one from the Employer agreed to sit down with the Union to bargain over the new General Order. Under the new General Order, one occurrence of any type of unauthorized absence within the previous 12 months automatically disqualifies an employee from approval for secondary employment. Harrington noted that, under the prior General Order, there had to be a causal relationship between the employee's secondary employment and the unauthorized absence infraction, but no causal relationship is necessary under the new General Order.

¶ 30     Michael Schassburger, Jr. testified that he is employed in the Cook County Sheriff's Office in the Office of Policy and Accountability. His responsibilities include writing policies and rules for the Sheriff, and he was involved in drafting the secondary employment policy. In his opinion, the new General Order merely clarifies the old Order. According to Schassburger, there were no Union members involved in developing the new General Order.

Schassburger testified that he has worked secondary employment since 2006. Prior to July 2013 and the new General Order, he would not have had to fill out any paperwork if he were not intending to work secondary employment. He testified that, after July 2013, a person who did not want to work secondary would have to fill out paperwork to that effect, and stated, "[t]hat would be a new function with the order."

¶ 31    Michael Vendafreddo testified he is a business representative employed by the Union, representing bargaining units including the Cook County Court Services Deputies. His work duties include negotiating contracts, handling grievances, and conducting labor management meetings. He was the chief negotiator during the bargaining sessions between October 2012 and July 2013, and he attended all eight sessions that were held. He testified that the Sheriff's Office never raised the issue of secondary employment during those bargaining sessions.

¶ 32    On March 9, 2015, the ALJ issued a recommended decision and order (RDO), finding in favor of the Union. The ALJ concluded that the new secondary employment policy was a mandatory subject of bargaining, that the Employer violated the Act by failing or refusing to bargain it prior to implementation, and that the Employer violated the Act by unilaterally changing the criteria for obtaining approval to work a second job, establishing objective attendance and disciplinary criteria in reviewing and revoking previously authorized secondary employment, and requiring all employees to submit an annual secondary employment disclosure form. It made the following specific conclusions of law:

"1. [The Employer] violated Section 10(a)(4) and (1) of the Act when, [it] unilaterally changed their secondary employment policy to require that the approval of secondary employment to be based upon previously unconsidered attendance and discipline criteria.

2. [The Employer] violated Section 10(a)(4) and (1) of the Act when, [it] unilaterally changed their secondary employment policy to require that the review and revocation of previously authorized secondary employment were to be based on newly established objective attendance and disciplinary criteria.

3. [The Employer] violated Section 10(a)(4) of the Act when, [it] unilaterally changed their secondary employment policy to require that all employees complete annual Secondary Employment Disclosure Forms."

¶ 33   The ALJ also determined that, even if the Employer had established that the changes involved a matter of inherent managerial policy, the new General Order was still a mandatory subject of bargaining because the benefits of bargaining over the policy outweighed any burdens bargaining would have imposed on the Employer's ability to perform their statutory duties. The ALJ also determined that the changes to the criteria for maintaining approval to work a second job and the new annual reporting requirement altered the *status quo*, and the Employer had refused to bargain over the new General Order when Kramer refused to respond to the Union's demand to bargain over the new policy prior to its implementation, noting:

"On July 12, 2013, the Union demanded to bargain over [the Employer's] proposed changes to its secondary employment policy. On August 1, 2013, the [Employer] implemented [the new General Order], containing such changes. At no point between the date the Union demanded to bargain and the date the [Employer] implemented [the new General Order] did the parties reach either an agreement or impasse regarding the changes contained in [the new General Order]. Since the at-issue changes are mandatory bargaining subjects, the [Employer] breached [its] duty

to bargain in good faith when [it] implemented [the new General Order]. Therefore, by implementing the changes to the secondary employment policy without negotiating with the Charging Party to impasse, or agreement [the Employer] failed and refused to bargain in violation of Section 10(a)(4) and (1) of the Act."

¶ 34 The Employer filed exceptions to the RDO on April 24, 2015. On September 29, 2015, the Labor Board dismissed the Employer's exceptions and issued its order, adopting and upholding the decision of the ALJ "for the reasons set forth by the Administrative Law Judge."

¶ 35 The Employer appeals.

¶ 36                                    II. ANALYSIS

¶ 37 On appeal, the Employer contends the Board's decision is clearly erroneous. In support, it argues the new General Order is not subject to bargaining, as it is within the Employer's inherent managerial authority; the new secondary employment policy does not change hours, wages or conditions of employment; and it does not impose new discipline on employees. The employer also contends the complaint should be dismissed because the Union was not denied the opportunity to bargain over the new General Order.

¶ 38 Judicial review of a decision of the Labor Relations Board is governed by the Administrative Review Law. 735 ILCS 5/3-101 *et seq*. (West 2014); see also *AMF Messenger Service, Inc.*, v. *Department of Employment Security*, 198 Ill. 2d 380, 395 (2001); *Northwest Mosquito Abatement District v. Illinois State Labor Relations Board*, 303 Ill. App. 3d 735, 741 (1999). Under the Administrative Review Law, the scope of judicial review extends to all questions of law and fact presented by the record before the court. 735 ILCS 5/3-110 (West 2014); see also *AMF Messenger Service, Inc.*, 198 Ill. 2d at 395.

- 22 -

¶ 39    The applicable standard of review, which determines the degree of deference afforded to an agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact. *AMF Messenger Services, Inc.*, 198 Ill. 2d at 395; see also *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998) ("[t]he standard of review applicable to the agency's decision depends upon whether the question presented is one of fact or law"). An administrative agency's findings on questions of fact are deemed to be *prima facie* true (735 ILCS 5/3-110 (West 2014)), and a reviewing court will reverse the Board's factual determinations only if it concludes that they were contrary to the manifest weight of the evidence. *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 819 (2009); see also *Illinois Fraternal Order of Police Labor Council v. Illinois Local Labor Relations Board*, 319 Ill. App. 3d 729, 736 (2001) ("[T]he decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident."). The Board's conclusions of law, however, are not entitled to the same deference, and we review them *de novo*. *Sudzus*, 393 Ill. App. 3d at 819. If the question presented for review is one of mixed law and fact, then a third standard of review applies, and we review the Board's decision to determine if it was clearly erroneous. *AMF Messenger Service, Inc.*, 198 Ill. 2d at 395. An agency's decision is clearly erroneous when the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *AMF Messenger Service, Inc.*, 198 Ill. 2d at 395; see also *Hurst v. Department of Employment Security*, 393 Ill. App. 3d 323, 327 (2009); *Department of Central Management Services v. Illinois Labor Relations Board, State Panel*, 2011 IL App (4th) 090966, ¶ 129 (under the clearly erroneous standard, if there are two reasonable but opposing views of

whether the facts satisfy the statutory standard, "the Board cannot have committed clear error by choosing between those views").

¶ 40 In the present case, the Employer argues that all of the issues on appeal are mixed questions of law and fact and, therefore, should be addressed under the clearly erroneous standard of review. We disagree. While two of the issues before us contain mixed question of law, two others are purely factual questions. We therefore review the questions of whether the Board's decision must be reversed because the Employer's secondary employment policy is not subject to bargaining because it is within its inherent managerial authority, as well as the question of whether the complaint should be dismissed because the Employer has not refused to bargain the issue of secondary employment, both of which are mixed question of law and fact, under the clearly erroneous standard. See *AMF Messenger Service, Inc.*, 198 Ill. 2d at 395. The remaining questions before us, that is, whether the Board's decision must be reversed because the secondary employment policy is not a new policy and does not change wages, hours, or other conditions of employment, as well as whether the secondary employment policy increases the opportunity for new employee discipline, are questions of fact and, therefore, reviewed under the manifest weight of the evidence standard. See *Sudzus*, 393 Ill. App. 3d at 819.

¶ 41                                    i. Mandatory Subject of Bargaining

¶ 42 The Act imposes a duty on the Employer, as a public employer, to engage in good-faith collective bargaining with its employees' representative when circumstances mandate bargaining. 5 ILCS 315/10(a)(4) (West 2012); *Forest Preserve District of Cook County v. Illinois Labor Relations Board*, 369 Ill. App. 3d 733, 754 (2006) (an employer's refusal to negotiate over a mandatory subject of bargaining constitutes an unfair labor practice). A

public employer commits an unfair labor practice and violates section 10(a)(4) of the Act when it refuses to bargain in good faith with a labor organization that is the exclusive representative of a bargaining unit of public employees. 5 ILCS 315/10(a)(4) (West 2012). When a public employer breaches its obligation to collectively bargain in good faith pursuant to section 10(a)(4) of the Act, it also violates section 10(a)(1) of the Act, which prohibits an employer from interfering with employees in the exercise of their rights under the Act. 5 ILCS 315/10(a)(1) (West 2012). The duty to collectively bargain in good faith under the Act extends to issues that arise during the term of a collective bargaining agreement. *Mt. Vernon Educational Ass'n, IEA-NEA v. Illinois Education Labor Relations Board*, 278 Ill. App. 3d 814, 816 (1996).

¶ 43     The duty to bargain collectively is defined, in relevant part, by section 7 of the Act, as follows:

> "the performance of the mutual obligation of the public employer or his designated representative and the representative of the public employees to meet at reasonable times, including meetings in advance of the budget-making process, and to negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by Section 4 of this Act, or the negotiation of an agreement, or any question arising thereunder and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession." 5 ILCS 315/7 (West 2012).

Section 7 of the Act requires parties to bargain with respect to employees' wages, hours and other conditions of employment, that is, with mandatory subjects of bargaining. *Forest Preserve District of Cook County*, 369 Ill. App. 3d at 751-52.

¶ 44    Mandatory subjects of bargaining are matters over which parties are required to negotiate in good faith, but on which they are not required to reach agreement or make concessions. *Board of Trustees of the University of Illinois v. Illinois Education Labor Relations Board*, 244 Ill. App. 3d 945, 949 (1993). Pursuant to section 7 of the Act, an employer has a duty to bargain over issues that affect "wages, hours, and other conditions of employment." 5 ILCS 315/7 (West 2012).

¶ 45    In general, courts apply the test set forth by our supreme court in *Central City Education Ass'n v. Illinois Labor Relations Board*, 149 Ill. 2d 496, 523 (1992), to determine whether a matter is a mandatory subject of bargaining. *County of Cook v. Illinois Labor Relations Board, Local Panel*, 347 Ill. App. 3d 538, 545 (2004). Step one requires the Board to answer whether the issue concerns "one of wages, hours and terms and conditions of employment," a question "the [governing Board is] uniquely qualified to answer." *Central City Education Ass'n*, 149 Ill. 2d at 523. With an affirmative answer, the second step requires the Board to determine whether the question impinges upon the "inherent managerial authority" of the employer. *Central City Education Ass'n*, 149 Ill. 2d at 523. If the answer to this second question is in the negative, then the matter is a mandatory subject of bargaining, but if the answer is in the affirmative, the Board advances to the third prong, which requires it to "balance the benefits that bargaining will have on the decisionmaking process with the burden that bargaining imposes on the employer's authority." *Central City Education Ass'n*, 149 Ill. 2d at 523.

¶ 46     Here, in accord with the Board, we find that the secondary employment policy in the new General Order was a mandatory subject of bargaining. To determine whether the first prong of the *Central City* inquiry has been fulfilled, *e.g.*, whether the issue concerns "wages, hours and terms and conditions of employment" (*Central City Education Ass'n*, 149 Ill. 2d at 523), we must determine whether the Employer's change in the criteria for denying and revoking secondary employment and its addition of a mandatory annual disclosure to the secondary employment policy in the new General Order "(1) involved a departure from previously established operating practices, (2) effected a change in the conditions of employment, or (3) resulted in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the bargaining unit." *Chicago Park District v. Illinois Labor Relations Board, Local Panel*, 354 Ill. App. 3d 595, 602 (2004).

¶ 47     As noted above, there were several changes between the new General Order and the prior General Order regarding secondary employment. First, the new General order included new conditions under which secondary employment approval may be withheld or revoked. For example, the new General Order provided :

> "A. Secondary Employment may be denied or revoked when an employee:
>
> * * *
>
> (3) Has incurred one (1) or more instances of an unauthorized absence in the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests;
>
> (4) Has incurred four (4) or more instances of documented tardiness for duty in the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests. For purposes of this Order,

- 27 -

an instance of documented tardiness is defined as when the employee timecard has been coded 'Tardy.'

(5) Has been on Proof Status within the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests;

(6) Has received discipline from his/her original Department or from OPR resulting in a suspension of a total of three (3) or more days for a single infraction that occurred within the previous twelve (12) months from October 1st of the current year for annual requests or from the date of application for new requests."

When asked about these changes at the hearing, the Employer's Special Counsel for Labor Affairs Kramer, explaining that "proof status" is a term of art regarding employees who have attendance-related issues, agreed that the prior General Order did not state as a possible condition for denial or revocation of secondary employment that an officer "[h]as been on proof status within the previous 12 months." Additionally, Kramer agreed that the new General Order states that a suspension of a total of three or more days for a single infraction that occurred within the prior 12 months could be a basis for denial or revocation of secondary employment, while the old General Order did not.

¶ 48    Additionally, Chief Union Steward Deputy Sheriff Harrington testified that under the new General Order, one occurrence of any type of unauthorized absence within the previous 12 months automatically disqualifies an employee from approval for secondary employment. Harrington noted that, under the prior General Order, there had to be a causal relationship between the employee's secondary employment and the unauthorized absence infraction, but no causal relationship is necessary under the new General Order. Assistant Director of the

Investigations Unit of the OPR Myslinski also agreed that an employee could have his secondary employment revoked or denied based on one or more unauthorized absences, such as a "no vacation day," a "no sick day," an unauthorized leave day, or a "no personal time" day. He testified that "to the best of [his] knowledge," this was a new condition of revocation or denial under the new General Order. In addition, under the new General Order, an employee who incurs 4 or more instances of documented tardiness for duty in the previous 12 months can have his secondary employment denied or revoked. Myslinski testified that this, too, was a new requirement under the new General Order. Another new requirement under the new General Order, according to Myslinski, is that an employee suspended three or more days can have his secondary employment denied or revoked.

¶ 49    While we recognize that the rationale behind these changes appears to have been that the employees' attendance issues may be caused by the secondary employment itself, that does not change the fact that establishing attendance as a basis for denying or revoking secondary employment constitutes a significant impairment to obtaining such reasonably anticipated secondary employment and involves a departure from previous operating practices. See, *e.g.*, *Chicago Park District*, 354 Ill. App. 3d at 602.

¶ 50    Additionally, the new General Order imposed an annual disclosure requirement for officers who do not intend to work secondary employment in the upcoming year, providing:

> "A. All *** employees must complete and submit a Secondary Employment Disclosure Form, through his/her chain of command, indicating whether or not he/she works Secondary Employment on an annual basis pursuant to this Order beginning October 1, 2013 and each October 1st thereafter. The deadline for submittal of all Secondary Employment Disclosure Forms is October 1st."

The prior General Order only imposed a disclosure/approval requirement for those officers who desired to work a second job in the upcoming year, rather than requiring that all employees do so. It provided:

> "Prior to accepting or commencing any secondary employment, permission must be obtained through the chain of command from the Department Head."

Under the new General Order, however, all employees now have the responsibility to submit secondary employment paperwork on an annual basis, regardless of their intention to work secondary employment. As testified to by Kramer, prior to the new General Order, an employee who did not submit a secondary employment application and had no intention of working secondary employment would not have been subject to discipline. Under the new General Order, however, that same employee who had no intention of working secondary employment would now be subject to discipline. Assistant Director of the Investigations Unit of the OPR Myslinski also agreed that the new General Order created a new requirement for employees, regardless of whether or not they were working secondary employment. He testified:

> "[TEAMSTERS ATTORNEY CASPER:] Q. You would agree with me that this General Order *** created a new requirement that Sheriff's Office employees disclose if they're not working secondary employment by October 1st of each year; correct?
>
> [WITNESS MYSLINSKI:] A. Correct.
>
> Q. That had never been a policy before; correct?
>
> A. Correct."

¶ 51    Myslinski also agreed that an employee who fails to submit the required form stating whether or not he is working secondary employment could be disciplined on a number of levels, stating:

> "[TEAMSTERS ATTORNEY CASPER:] Q. All right. And you would agree with me that if an employee fails to complete that form, he could possibly be subject to investigation by OPR; is that correct?
>
> [WITNESS MYSLINSKI:] A. Correct.
>
> Q. And OPR, if they found that the employee failed to meet that requirement, they could recommend discipline; correct?
>
> A. Correct.
>
> Q. And OPR is not the only potential investigatory body in the Cook County Sheriff's Office, the employee's chain of command can also investigate an employee for misconduct; correct?
>
> A. Correct.
>
> Q. And if an employee's chain of command found that the employee failed to complete the disclosure form by October 1st of each year, the chain of command can recommend discipline, correct?
>
> A. Correct."

¶ 52    Michael Schassburger, who works in the Office of Policy and Accountability, opined that the new General Order merely clarifies the prior General Order. Nonetheless, he agreed that no Union members were involved in developing the new General Order, and he agreed that, prior to the new General Order, an employee would not have had to fill out any secondary

employment paperwork if the employee did not intend to work secondary employment. Under the new General Order, however, that same employee would have to fill out that paperwork. Schassburger agreed that "[t]hat would be a new function with the order[.]"

¶ 53    The annual disclosure requirement in the new General Order imposes a new obligation on employees, and an employee who does not comply with the reporting requirement may be subject to discipline. We agree with the Board,[4] which said, "Creating new criteria for denying secondary employment and establishing objective threshold standards for revoking secondary employment authorization constitute significant impairments of reasonably anticipated work opportunities for the employees at issue, and involve departures from the previous operating practices." We also agree with the determination of the Board that the annual mandatory disclosure requirement set forth in the new General Order is a departure from the previous practices under the prior General Order and that, because an employee is subject to discipline for failing to complete and submit the annual disclosure form, this also effects a change in the conditions of employment. See, *e.g.*, *Chicago Park District*, 354 Ill. App. 3d at 602.

¶ 54    The Board did not err in determining that the new General Order satisfied the first prong of *Central City* where, by changing the criteria for obtaining approval to work a second job and imposing a new annual disclosure requirement, the policy departed from the previously established practices and implemented a material change to the existing policy that impaired an employee's ability to maintain a second job. Where the changes in the denial and revocation criteria for secondary employment, as well as the mandatory annual secondary

---

[4]In this Order, for purposes of continuity, when we quote the lengthy and thoughtful RDO issued by the ALJ, which was thereafter upheld and adopted by the Board "for the reasons set forth by the Administrative Law Judge," we attribute the quote to the Board.

employment disclosures concern wages, hours, and terms and conditions of employment, the record establishes that the first prong of the *Central City* test is satisfied. *Central City Education Ass'n*, 149 Ill. 2d at 523; *Chicago Park District*, 354 Ill. App. 3d at 602.

¶ 55     Next, the Employer maintains that it has satisfied the second prong of the *Central City* test, arguing that the "issue of secondary employment is not subject to bargaining due to the strong connection between the operational costs and liability involved in secondary employment and the employer's statutory responsibilities of law enforcement and employee conduct." This "strong connection" exists, it argues, because the Sheriff and his agents have custody and care of the courthouse and jail[5] and are required to prevent crime and maintain the safety of the County's citizens,[6] and because the Sheriff, by statute, is liable for his subordinates' neglect or omission of duties.[7] We disagree.

¶ 56     The second step in the *Central City* analysis requires determination of whether the question impinges upon the "inherent managerial authority" of the employer. *Central City Education Ass'n*, 149 Ill. 2d at 523; *City of Belvidere*, 181 Ill. 2d at 206 ("The second prong considers whether the matter, in addition to affecting wages, hours and terms and conditions of employment, is also one of inherent managerial authority."). To satisfy this second prong of the analysis, the employer has the burden to link the objective of the challenged policy

---

[5]"55 ILCS 5/3-6017. Sheriff custodian of courthouse and jail. § 3-6017. Sheriff custodian of courthouse and jail. He or she shall have the custody and care of the courthouse and jail of his or her county."

[6]"55 ILCS 5/3-6021. Conservator of the peace. § 3-6021. Conservator of the peace. Each sheriff shall be conservator of the peace in his or her county, and shall prevent crime and maintain the safety and order of the citizens of that county; and may arrest offenders on view, and cause them to be brought before the proper court for trial or examination."

[7]"55ILCS 5/3-6016. Sheriff liable for acts of deputy and auxiliary deputy. § 3-6016. Sheriff liable for acts of deputy and auxiliary deputy. The sheriff shall be liable for any neglect or omission of the duties of his or her office, when occasioned by a deputy or auxiliary deputy, in the same manner as for his or her own personal neglect or omission."

with a core managerial right. *County of Cook*, 347 Ill. App. 3d at 552. Here, the Employer argues that its inherent managerial authority is impinged upon, but it fails to draw a connection between the new conditions regarding the denial and revocation of secondary employment, as well as the new annual disclosure requirement, and its managerial responsibilities of operating a safe courthouse and jail, preventing crime, or maintaining citizens' safety. There is no evidence in the record before us that the disputed changes to the secondary employment policy interfere with any such matters. Although the Employer generally claims that the new General Order will improve the quality of the public services it is statutorily required to provide, it has not presented an explanation or evidence about how the new policy is connected to that goal. We find no clear error in the Board's determination that the new secondary employment policy in the new General Order was not part of the Employer's inherent managerial authority.

¶ 57     Because then, pursuant to *Central City Education Ass'n*, we have found that the issue is "one of wages, hours and terms and conditions of employment," we moved on to the second prong of the *Central City* test. Because we then determined, pursuant to the second *Central City* prong, that the issue of the new secondary employment policy under the new General Order is not one of inherent managerial authority, the issue is a mandatory subject of bargaining and our inquiry in this matter ends. *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 97 (2007) ("If the issue does not involve the employer's inherent managerial authority, then it is subject to mandatory bargaining."); *City of Belvidere*, 181 Ill. 2d at 206 ("The second prong considers whether the matter, in addition to affecting wages, hours and terms and conditions of employment, is also one of inherent managerial authority. [Citation.] If the answer to this question is no, the analysis ends and the

matter is considered a mandatory subject of collective bargaining."). The new secondary employment policy under the new General Order, then, is a mandatory subject of collective bargaining.

¶ 58    Even if the changes to the secondary employment policy did satisfy the second prong of the *Central City* test and we were to proceed to prong three of the *Central City* analysis, however, the result would not change, as we would find that the benefits of bargaining outweigh the burdens of bargaining. The third prong of the *Central City* test requires a "balancing of the benefits to the decisionmaking process against the burdens that bargaining would impose" upon the Employer's authority. See *Chicago Park District*, 354 Ill. App. 3d at 602 (citing *Central City Education Ass'n*, 149 Ill. 2d at 523). Because this step is "very fact-specific," the Board is "eminently qualified to resolve" this balancing test. (Internal quotation marks omitted.) *Board of Trustees of the University of Illinois*, 224 Ill. 2d at 97.

¶ 59    Again citing sections 3-6021 and 3-6017 of the Counties Code, the Employer argues that the "public policies regarding crime, citizen safety, and security of correctional and court facilities weigh in favor of the Sheriff and outweigh the union's interest in bargaining." As quoted above, these statutory sections deal with the Sheriff's responsibility as "conservator of the peace" and "custodian of the courthouse and jail." 55 ILCS 5/3-6021, 3-6017 (West 2012). The crux of the Employer's argument in this regard is: "The Board reasoned that the Sheriff's Office did not 'intimately connect' the secondary employment policy with its mission. The Board's analysis completely ignored the intent of the legislature, setting forth the obligations placed in the Sheriff, regarding the mandatory duties of police officers." However, as noted previously, the Employer failed to establish how the change in the secondary employment requirements was necessary to effectuate its purpose; it has not

- 35 -

provided any evidence that bargaining over the changes to the secondary employment policy would diminish its ability to effectively perform its statutory duties as custodian of the jail and keeper of the peace. Rather, the Employer seems to argue that, if required to bargain, it will be unable to effectuate its mission. However, bargaining does not require such an extreme result. See 5 ILCS 315/7 (West 2012) ("A public employer and the exclusive representative have the authority and the duty to bargain collectively" but "such obligation does not compel either party to agree to a proposal or require the making of a concession.").

¶ 60       Here, the Union members have a significant interest in under what circumstances they are allowed to work in secondary employment during the time when they are not on duty with the Employer. The Union argues that bargaining could have resulted in a solution that satisfied both parties. It argues:

> "The benefits both parties would derive from bargaining are great. The employees have a keen interest in restrictions on how they spend their time away from work. This includes how they can plan and budget for secondary employment and how they can secure approval for it, as well as guard against that approval being taken away. They also have an important interest in how and under what circumstances they will be disciplined and what are to be the consequences of that discipline. The Employers also stand to benefit from the bargaining process. By engaging in bilateral discussions, they will receive the benefit [of] the information received from good faith discussions about the implementation and operation of this General Order and will benefit from the opportunity to discuss and constructively resolve potential problems in advance."

¶ 61        We agree that, here, in balancing the benefits and the burdens of bargaining, the scale tips in favor of the benefits of bargaining and find no error in the Board's decision in this regard.

¶ 62                                ii. The Status Quo

¶ 63        For the same reasons, we also reject the Employer's contention that the Board erred in finding the new secondary employment terms violated the status quo. (Employer commits unfair labor practice by making unilateral changes to terms or conditions of employment that alter the status quo. " 'Unilateral' changes are those alterations implemented without prior negotiation to impasse. [Citation.] Such changes are prohibited so the status quo might be maintained until new terms and conditions of employment are arrived at through bilateral negotiation and by mutual agreement. [Citations.]"). See, *e.g.*, *Vienna School Dist. No. 55 v. Illinois Educational Labor Relations Board*, 162 Ill. App. 3d 503, 507-9 (1987). Here, the Board determined that the new General Order altered the status quo by changing the criteria for denying and revoking approval to work a second job, as well as by requiring employees to annually disclose their secondary employment status. The employer argues on appeal that there was no actual change between the prior General Order and the new General Order. As we have determined above that the annual disclosure requirement in the new General Order imposed new obligations on the employees, that an employee who did not comply with the requirement would be subject to potential discipline, and that the new secondary employment policy materially changed the terms and conditions of employment by making it more difficult to obtain approval to work a second job, we find no error in the Board's determination that the new secondary employment terms violated the status quo.

¶ 64                                iii. Failure to Bargain

¶ 65    Finally, the Employer contends the complaint should be dismissed because (1) the Employer has not refused to bargain the issue of secondary employment and (2) the negotiations are ongoing. We disagree.

¶ 66    A public employer has a duty to engage in good-faith collective bargaining with its employees' representative when circumstances mandate bargaining. 5 ILCS 315/10(a)(4) (West 2012); *Forest Preserve District of Cook County*, 369 Ill. App. 3d at 754 (an employer's refusal to negotiate over a mandatory subject of bargaining constitutes an unfair labor practice). A public employer commits an unfair labor practice and violates section 10(a)(4) of the Act when it refuses to bargain in good faith with a labor organization that is the exclusive representative of a bargaining unit of public employees. 5 ILCS 315/10(a)(4) (West 2012); *Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board*, 153 Ill. App. 3d 744, 755 (1987) ("When an employer has a duty to bargain about an issue which is a mandatory subject of collective bargaining and refuses to negotiate, it commits a *per se* unfair labor practice."). When a public employer breaches its obligation to collectively bargain in good faith pursuant to section 10(a)(4) of the Act, it also violates section 10(a)(1) of the Act, which prohibits an employer from interfering with employees in the exercise of their rights under the Act. 5 ILCS 315/10(a)(1) (West 2012). "[W]hen an employer has the duty to bargain, it need only provide notice of its willingness to bargain prior to the time at which its plans are fixed." *Service Employees International Local Union No. 316*, 153 Ill. App. 3d at 755. The duty to collectively bargain in good faith under the Act extends to issues that arise during the term of a collective bargaining agreement. *Mt. Vernon Educational Ass'n, IEA-NEA*, 278 Ill. App. 3d at 816.

¶ 67        The Employer argues that this issue is not "ripe" for review because negotiations are ongoing. However, the Employer is charged with having failed to bargain over the new secondary employment policies in the new General Order, which took effect August 1, 2013. The ongoing negotiations over successor CBAs are irrelevant to the new General Order that took effect over three years ago.

¶ 68        Here, the Employer unilaterally changed the terms and conditions of employment for the affected bargaining unit members, and implemented these changes without giving the Union adequate notice and an opportunity to bargain. The Board and, now, this court, determined that the matter was a mandatory subject of bargaining. The Act requires the parties to bargain to impasse or resolution on those matters that are mandatory subjects of bargaining. See, *e.g.*, *Vienna School District No. 55*, 162 Ill. App. 3d at 507-09. On July 8, 2013, the Employer issued Sheriff's Order 1, which rescinded the prior General Order and established a new secondary employment policy and procedures. On July 12, 2013, the Union—believing this Order imposed new provisions and requirements on employees, presented new opportunities for discipline, and contradicted and supplemented existing collective bargaining language— sent an email and letter demanding to bargain the change and its effects. The email was dated July 12, 2013, and the letter was dated July 11, 2013. Both dates were prior to the August 1, 2013, effective date of the new General Order. The Employer did not respond to the demand nor offer to bargain. On or about July 23, 2014, it rescinded Sheriff's Order 1 and replaced it with Sheriff's Order 11.4.55.1 (new General Order). This Order was identical to Sheriff's Order 1 except for one date change. All of the issues with which the Union took issue in Sheriff's Order 1 were still present in the new General Order. The Union again demanded to bargain. The Employer again did not respond. The new General Order became effective

August 1, 2013. At the hearing, Cook County Sheriff's Office Special Counsel for Labor Affairs Kramer confirmed that he did not respond to Union emails demanding they bargain over the new secondary employment policy. Union General Counsel Camden also testified that he had attended all of the local bargaining sessions, and the Employer never negotiated over the new secondary employment policy. Additionally, Union business representative Vendafreddo, who was the chief negotiator during the bargaining sessions between October 2012 and July 2013, testified that the Employer never raised the issue of secondary employment during those bargaining sessions.

¶ 69    Clearly, the Union presented repeated demands to bargain prior to the effective date of the new General Order. The Employer disregarded these requests and unilaterally changed the terms and conditions of employment without notice and an opportunity to bargain. The Employer had the duty to bargain in good faith, and it did not do so. We find no error in the Board's finding that the Employer failed to bargain over the new General Order and its determination that the Employer violated the Act by failing to do so.

¶ 70                                    III. CONCLUSION

¶ 71    For all of the foregoing reasons, the decision of the Illinois Labor Relations Board is affirmed.

¶ 72    Affirmed.